# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3401

_____

| | | |
|---|---|---|
| Barbara Sparr, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Janet Ward, individually and in her | * | |
| official capacity as an employee of the | * | Appeal from the United States |
| Pulaski County Tax Assessor's Office, | * | District Court for the Eastern |
| | * | District of Arkansas. |
| Defendant, | * | |
| | * | |
| B. A. McIntosh, individually and in his | * | |
| official capacity as an employee of the | * | |
| Pulaski County Tax Assessor's Office, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: May 15, 2002

Filed: October 7, 2002 (Corrected 10/21/02)

_____

Before LOKEN, BOWMAN, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

This is an appeal from the district court's denial of a motion for summary judgment based upon the defense of qualified immunity in a civil rights action

alleging unlawful termination of employment in retaliation for exercise of First Amendment rights to free speech. Because we find no violation of a clearly established constitutional right, we reverse.

I.

Barbara Sparr was employed by the Pulaski County Assessor's office from January, 1991, until her discharge on August 22, 2000. During her tenure with the Assessor's office the County Assessor was B.A. McIntosh. At the time of her termination, Sparr was working as an administrative assistant to McIntosh and the Chief Deputy Assessor, Janet Ward.

In 2000, McIntosh chose to retire and Ward decided to run for County Assessor. Ward told Sparr she would promote her to Chief Deputy Assessor if Ward won the election. Initially, Sparr supported Ward's candidacy but later changed her mind and refused to support Ward or to accept the Chief Deputy Assessor position. Sparr advised Ward of her change of heart in a memorandum dated August 21, 2000.[1]

---

[1]The memorandum read as follows:

> Janet, you have indicated that upon your election to the position of Assessor in the November 2000 [sic], I would be placed into the Chief Deputy position with an assigned county vehicle. I have indicated to you my interest in this upgrade and appreciate your confidence in me, but after much soul searching I must decline the upgrade.
>
> As you know I have been with the Assessor's office since January 1991. During this period I have worked under B.A."Mac" McIntosh, and I may not have agreed with all his policies, but I have always respected, honored and

supported his position and his political campaigns because I believed in him.

Since your tenure as Chief Deputy you have encouraged me to continue my education and raised my salary accordingly and this is much appreciated. However, I also realize that all the hard work of studying, passing the necessary IAAO course work to gain my Senior Appraiser (Administration) status given by ACD is a goal I set for myself and accomplished. I have had many achievements during the last ten (10) years of employment, but of those I hold in highest regard are the "Outstanding Achievement Award" presented to me by Mr. McIntosh at the Assessor's Annual Christmas luncheon in December 1999, and my Certificate as ["]Senior Appraiser in Administration" from State Assessment Coordination Division. Of course receiving the monetary reward from the State of Arkansas of $500 for achieving this designation was great.

Under my request and Mr. McIntosh's advice you have placed me in a position of day to day operations of personnel matters so that your time can be spent on the upcoming appraisal. I again appreciate your confidence, however I have come to realize that our differences in management styles are so different that it would be extremely difficult and stressful for me to be the [sic] in the position of Chief Deputy. I believe I can better serve Pulaski County in my present position. I look forward to the opportunity of continuing my college education, paid by the County and will certainly pay it back with my work and support.

Feeling as I do, I cannot in good conscience campaign

Before giving the memorandum to Ward, Sparr showed it to McIntosh. She asked for his advice and sought assurances that he would protect her job. McIntosh encouraged Sparr to give the memorandum to Ward. He noted, however, that Sparr had copied the memorandum to Temperlene Smith, Pulaski County Personnel Director, and instructed Sparr not to provide Smith with a copy. McIntosh wanted to keep the matter "in house" and was concerned problems would escalate if the memorandum was circulated outside the Assessor's office. Sparr nevertheless met with Smith and gave her a copy of the memorandum. Smith read the memorandum, discussed it with Sparr and Smith's supervisor, and placed it in Sparr's personnel file. At no time did Sparr ask or expect Smith to take any further action regarding the memorandum. Shortly thereafter, Sparr delivered a copy of the memorandum to Ward. Later that day, McIntosh discovered Sparr had given the memorandum to Smith. The next day he called Sparr and terminated her position.

for you in your quest for Assessor in the November election. I will always treat you with respect in your position, whatever it may be, but I council [sic] you to take a serious look at present management style and techniques. There are employees being hurt emotionally, spying on one another, spreading untrue rumors about other employees, sexual language to female and male employees to encourage undesired relationships which could result in more sexually discriminating [sic] suits against Pulaski County. You have so much to offer in your present position and possibly the next Assessor of Pulaski County, but only if a straight-forward and honest approach is used with employees as to what their positions are and will be. An office cannot move forward with promises to employees that cannot be kept, or employees that are afraid of losing their livelihood in declining management's personal, unethical requests.

Sparr brought this action seeking relief under the First Amendment and 42 U.S.C. § 1983; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to 2000e-17; and the Arkansas Civil Rights Act of 1993, Ark. Code Ann. § 16-123-101 to 16-123-108. (Supp. 2001). Sparr claims she was discharged in retaliation for speaking out about sexual harassment in the Assessor's office, and for exercising her First Amendment right to refuse to support Ward's candidacy.

McIntosh moved for summary judgment in his individual capacity arguing he was entitled to qualified immunity. The district court rejected McIntosh's qualified immunity defense finding Sparr's speech was on a matter of public concern and her right to free speech outweighed the interests of her employer. On appeal, McIntosh contends the district court erred by finding Sparr's speech protected by the First Amendment, and by finding her right to free speech outweighed the interests of her employer.

II.

Qualified immunity is an affirmative defense for which the defendant carries the burden of proof. The plaintiff, however, must demonstrate that the law is clearly established. Johnson-El v. Schoemehl, 878 F.2d 1043, 1048 (8th Cir. 1989). The district court's denial of summary judgment on grounds of qualified immunity is subject to de novo review, Cornell v. Woods, 69 F.3d 1383, 1390 (8th Cir. 1995), taking as true Sparr's factual allegations and drawing all inferences from the underlying facts in Sparr's favor. Natale v. Town of Ridgefield, 927 F.2d 101, 104 (2d Cir. 1991).

The purpose of qualified immunity is to allow public officers to carry out their duties as they believe are correct and consistent with good public policy, rather than acting out of fear for their own personal financial well being. See generally Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982). Toward this end, the rule has evolved that

-5-

an official performing discretionary functions will generally be immune from liability unless a reasonable person in his position would have known his actions violated clearly established law. Anderson v. Creighton, 483 U.S. 635, 640 (1987). An official loses immunity if the law he violated was clearly established at the time of the violation, and the applicability of the law to his particular action was evident. Id.

The inquiry "focuses on the objective legal reasonableness of an official's acts," and the qualified immunity defense fails if the official violates a clearly established right because "a reasonably competent public official should know the law governing his conduct." Harlow, 457 U.S. at 818-19. To demonstrate the law is "clearly established," the plaintiff must show a "reasonable official would understand that what he is doing violate[s]" plaintiff's rights. Anderson, 483 U.S. at 640. We have taken a broad view of what constitutes "clearly established law" for the purpose of qualified immunity, requiring some but not precise factual correspondence with precedents and demanding officials apply "general, well-developed legal principles." Boswell v. Sherburne County, 849 F.2d 1117, 1121 (8th Cir. 1988); see also Lappe v. Loeffelholz, 815 F.2d 1173, 1177 (8th Cir. 1987). In determining the validity of a qualified immunity defense the issue is not whether the defendant acted wrongly, but whether reasonable persons would know they acted in a manner which deprived another of a known constitutional right. Malley v. Briggs, 475 U.S. 335, 344-45 (1986) (holding that police officers applying for warrant were shielded from liability if a reasonable police officer could have believed there was probable cause to support the application). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Id., at 341.

## III.

Our review follows a two-step inquiry to determine whether Sparr's speech was protected. First, we must determine whether her speech can be "fairly characterized

as constituting speech on a matter of public concern." Connick v. Myers, 461 U.S. 138, 146 (1983). If so, Sparr's right to comment on matters of public concern must next be balanced with the County's interest in "promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Education, 391U.S. 563, 568 (1968). Both parts of the Connick-Pickering inquiry are questions of law for the court to decide. Connick, 461 U.S. at 148 n.7, 150 n.10.

A matter of public concern is a matter of political, social or other concern to the community. Id., at 146. To determine whether speech qualifies as a matter of public concern, we must examine the content, form and context of the speech, as revealed by the whole record. Id. at 147-148; Shands v. City of Kennett, 993 F.2d 1337, 1343 (8th Cir. 1993). If we determine the speech is a matter of public concern, we then proceed to a Pickering analysis and consider a number of interrelated factors to balance the interests of the employee and the employer.

The district court determined as a matter of law that Sparr's memorandum constituted speech on a matter of public concern. The district court focused on the last paragraph of the memorandum and concluded the statements about Ward's management style and the County's exposure to litigation were matters of public concern sufficient to bring Sparr's speech within the protections of the First Amendment. On appeal, McIntosh contends the district court's review of the memorandum is unreasonably narrow. McIntosh argues the memorandum, when considered in its entirety, clearly evinces an intention to speak out privately on internal personnel matters. We agree.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context" of the speech, and the speech must relate to some "matter of political, social or other concern to the community." Connick, 461 U.S. at 146-47. When a public employee's speech is purely job-related, her speech will not be deemed a matter of public concern. Bauzard v. Meridith, 172

-7-

F.3d 546, 548 (8th Cir. 1999). "Unless the employee is speaking as a concerned citizen, and not just as an employee, the speech does not fall under the protection of the First Amendment." Id. It is not enough that the topic of an employee's speech is one in which the public might have an interest. Morgan v. Ford, 6 F.3d 750, 754 (11th Cir. 1993). We must determine whether the purpose of the speech was to raise issues of public concern or to further the employee's private interests. Id.

Sparr's memorandum was addressed only to McIntosh and Ward, with a carbon copy to Smith for placement in Sparr's personnel file. The memorandum contains mostly personal comments, i.e., expressions of gratitude and praise for both McIntosh and Ward which one would not expect to find in speech intended "to bring to light actual or potential wrongdoing or breach of public trust." Connick, 461 U.S. at 148. Only the last paragraph contains any speech touching on matters of public concern. Although the allegations of sexual harassment and mismanagement contained in Sparr's memorandum could be of concern to the public, the record demonstrates Sparr was speaking out as an employee, not as a concerned citizen. Sparr had chosen not to support Ward's candidacy or to accept a promotion to Chief Deputy assessor. Her memorandum to Ward was driven by her understandable self-interest in protecting her employment in the event Ward won the election — not by a desire to introduce matters of public concern into a public forum. Because Sparr's speech was motivated primarily by concerns over her employment, and not by her concern about matters of public concern, we find it undeserving of First Amendment protection. Morgan, 6 F.3d at 755 n.7 ("We will not permit an employee to manufacture First Amendment protection (thereby job security) by complaining on a matter related to a social concern."); cf. Barlett v. Fisher, 972 F.2d 911, 917 (8th Cir. 1992) (holding that when an employee's self-interest outweighs his interest as a citizen commenting on matters of public concern, the speech is not deserving of First Amendment protection).

Similarly, the context in which employee speech occurs is also relevant. Connick, 461 U.S. at 147. In this case, the evidence shows the statements were

entirely internal to the County Assessor's office. While a public employee does not give up her right to free speech simply because her speech is private, Givhan v. W. Consol. Sch. Dist., 439 U.S. 410, 414 (1979), the internal nature of Sparr's speech is a factor to be considered.

Sparr contends that giving a copy of the memorandum to Smith demonstrates her speech was on a matter of public concern because Smith was authorized to receive complaints of discrimination. Sparr, however, has presented no evidence suggesting her motivation for providing the memorandum to Smith was intended to bring the allegations of discrimination into the public eye. Indeed, Smith testified she had never received a complaint regarding sexual harassment and did not treat the memorandum as one. Further, Sparr testified she expected Smith to place the memorandum in her personnel file — nothing more. Thus, Sparr was motivated by a concern that her decision not to support Ward might adversely affect her employment. Her concerns were entirely understandable, but they belie her contention that she was motivated by a desire to speak out as a concerned citizen on matters of public concern.

Other decisions of this court have accorded employee speech protected status because it could be "fairly characterized as constituting speech on a matter of public concern." Connick, 461 U.S. at 146. We do not, however, find those cases apposite in this instance. For example, in Altman v. MN Dep't of Corr., 251 F.3d 1199, 1202 (8th Cir. 2001) we found Bible reading during a mandatory training program dealing with the issue of gays and lesbians in the workplace constituted nonverbal conduct deserving of First Amendment protection. Though the nonverbal protest in Altman was directed at an inherently internal policy, we found the employees' speech a matter of public interest and concern because their public employer forced employees to attend training which in their words constituted "state-sponsored indoctrination designed to sanction, condone, promote, and otherwise approve behavior and a style of life [they] believe[d] to be immoral, sinful, perverse, and contrary to the teachings

of the Bible." Id. at 1201-1202. Conversely, Sparr's speech cannot be construed as public or even private comment on a matter of such broad social or public concern. Inasmuch as it touched on matters which could be of interest to the public, its primary purpose was to ensure Sparr would keep her job.

## IV.

The content, form and context of Sparr's speech all show she was not speaking out as a private citizen on matters of public concern. Therefore, we do not need to reach the second part of the Connick-Pickering inquiry. Accordingly, the order of the district court denying McIntosh's motion for summary judgment in his individual capacity is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.