**Pamela J. VUKELIC, Plaintiff,**

v.

**Darleen BARTZ, in her individual capacity as Preventive Health Section Chief of the North Dakota Department of Health; and Murray G. Sagsveen in his individual capacity as the former North Dakota State Health Officer, Defendants.**

No. A1-01-146.

United States District Court,
D. North Dakota,
Southwestern Division.

Feb. 24, 2003.

Patricia R. Monson, Nilles, Hansen & Davies, Ltd., Fargo, ND, for Plaintiff.

Tag C. Anderson, Attorney General's Office, Bismarck, ND, for Defendants.

## MEMORANDUM AND ORDER

HOVLAND, Chief Judge.

### I. BACKGROUND OF THE CASE

This dispute arose out of actions alleged to have been taken by the defendants,

Darleen Bartz and Murray Sagsveen, against the plaintiff, Pamela J. Vukelic, while working for the North Dakota Department of Health [hereinafter referred to as the Health Department]. According to the plaintiff [hereinafter referred to as Vukelic], she was removed from her position as the Health Department's Director of the Division of Disease Control on May 31, 2000, under the guise of a departmental reorganization. Thereafter, Vukelic claims that she was subjected to retaliatory and punitive actions by the defendants. Vukelic submitted a letter of resignation and resigned from the Health Department on August 15, 2000. She contends that her reassignment amounted to a constructive discharge.

On December 31, 2001, Vukelic filed an action against defendants Bartz and Sagsveen under 42 U.S.C. §§ 1983 alleging: 1) retaliation in violation of the First Amendment, 2) deprivation of a property right without due process of law in violation of the Fourteenth Amendment, 3) injury to reputation in violation of the First Amendment and deprivation of liberty without due process of law in violation of the Fourteenth Amendment, 4) defamation, and 5) intentional/reckless infliction of emotional distress.

On August 14, 2002, the defendants filed a motion for dismissal pursuant to Rule 56 of the Federal Rules of Civil Procedure. The defendants characterize Vukelic as a disgruntled former employee dissatisfied with the ongoing reorganization of the Health Department. The defendants assert that a dismissal of the lawsuit is warranted because (1) the defendants are immune from suit under the doctrine of qualified immunity, (2) the Eleventh Amendment bars the plaintiff's state law claims, (3) the alleged defamatory statements are privileged and not capable of defamatory meaning, and (4) the plaintiff failed to identify facts that sup-

port her claim of intentional infliction of emotional distress.

## II. FACTS

The plaintiff, Pamela Vukelic, was employed at the Health Department from 1994 until her resignation in August of 2000. She initially served as the HIV/AIDS Program Manager for the Division of Disease Control. In May of 1998, Vukelic was named the Director of the Division of Disease Control. Defendant Murray Sagsveen [hereinafter referred to as Sagsveen] was appointed as the State Health Officer on February 1, 1998. Defendant Darleen Bartz [hereinafter referred to as Bartz] was designated as the Health Department's acting Chief of the Preventive Health Section on or about July 1, 1999, replacing Dr. Alana Knudson Buresh. The "acting" designation was removed in January of 2000.

Vukelic's problems with Sagsveen allegedly began in December 1998. The evidence reveals that Sagsveen reportedly confronted Vukelic and several other director/supervisors (Sandy Anseth and Sandy Adams) about a rumor circulating through the Health Department that he and Dr. Alana Knudson–Buresh were having an affair. According to Vukelic, Sagsveen thereafter became increasingly critical of the manner in which she ran her department.

In early July 1999, Vukelic shared her concerns with Darlene Bartz that a subordinate, Rod Gilmore, was using government property for personal reasons to an excessive degree. Vukelic learned that Gilmore had used federal grant monies to purchase ear plugs for the Bismarck Gun Club and she suspended Gilmore for thirty (30) days without pay. To Vukelic's chagrin, Gilmore's suspension was later overturned by Sagsveen on procedural grounds. According to Sagsveen, he had

never criticized Vukelic's handling of the incident. See Deposition of Sagsveen, p. 86.

In December of 1999, Sagsveen confronted Vukelic about the disclosure of protected health information in an article that had been published in the New England Journal of Medicine. To address confidentiality concerns, Sagsveen implemented a multi-step review procedure that Vukelic considered cumbersome and confusing.

In late May of 2000, Vukelic learned that Sagsveen had received a letter from State Representative Rod Froelich on May 2, 2000, and the letter was critical in part of the manner in which Vukelic managed her department. Vukelic was upset that Sagsveen had never informed her of the letter nor had Sagsveen sought her input when he formulated a response to the legislator. On May 30, 2000, Vukelic wrote a note to Sagsveen expressing concern and she requested to meet with Sagsveen to discuss the letter. Unsatisfied with Sagsveen's response, Vukelic consulted with her staff and then proceeded to initiate her own investigation into the allegations outlined in the letter of May 2, 2000, from Representative Froelich.

On May 31, 2000, Vukelic was called into Bartz's office and informed that she would be reassigned as part of an ongoing Health Department reorganization. The Health Department had experienced a number of personnel changes since Sagsveen became State Health Officer in February 1998. In late December 1998, Vukelic had expressed concerns to Sagsveen about the turmoil in the Health Department and the frequent and disruptive staff changes. See Deposition of Sagsveen, p. 57. Sagsveen testified that after he started work as the State Health Officer in February 1998, he had been exploring a reorganization of the Health Department to reduce administrative overhead and comply with a directive from the Governor to reduce the budget and the number of full-time equivalent positions. See Deposition of Sagsveen, p. 112. On May 31, 2000, Vukelic was notified that she would be reassigned different job duties and that her duties as Director of the Division of Disease Control were being combined with the job duties of the State Epidemiologist. Combining the State Epidemiologist duties and Director of Disease Control duties was a recommendation that had been made by Darlene Bartz to State Health Officer Sagsveen.

Despite the reassignment within the Health Department, Vukelic continued to earn the same salary and benefits. Following the reassignment, Vukelic immediately contacted the North Dakota Public Employee Association and a grievance was filed on her behalf by Executive Director Chris Runge. In a letter dated June 7, 2000, Sagsveen opined that Vukelic's reassignment was not a grievable action under state law.

The undisputed evidence has revealed that Vukelic and many other of the staff within the Division of Disease Control did not accept the reassignment and reorganization changes well. Following the announcement of the reorganizational decision, Vukelic and various members of Vukelic's staff contacted the Governor's Office, the First Lady, and several members of the Legislative Assembly of North Dakota to express their displeasure with Vukelic's reassignment and to complain about Sagsveen and his management of the Health Department. These contacts in turn led to numerous legislators contacting the Health Department in early June 2000 asking for an explanation of Vukelic's reassignment. The legislative contacts and subsequent inquiries were also eventually described in a number of newspaper articles that appeared in the Bismarck Tribune. In Vukelic's opinion, all of those actions prompted Sagsveen to

place her on administrative leave effective June 19, 2000.

On June 21, 2000, an article critical of Sagsveen appeared in the Bismarck Tribune. A second article appeared in the June 25th edition of the Bismarck Tribune which discussed the turmoil within the Health Department. Sagsveen responded to the newspaper articles in a letter dated July 3, 2000, wherein he attributed a breakdown in communications between the State Epidemiologist and the Division of Disease Control to Vukelic. Specifically, Sagsveen made the following relevant statements:

Several former and current department employees call me "authoritarian" and "intimidating," particularly because I approved the reassignment of duties for Pam Vukelic. There were many reasons for the reassignment that have not been explained in the newspaper articles.

When I appointed Darleen Bartz to manage two separate sections within the department, I asked her to carefully review the organization to determine if we could better and more efficiently serve the public. She recommended a number of changes, including the reassignment of Pam Vukelic, which I approved.

I approved the reassignment of Pam Vukelic (with no loss of pay or grade) for several organizational reasons. The new director of Disease Control, Larry Shireley, has been the state epidemiologist since 1990. He has a masters of science degree in health education, has a masters of public health degree, has extensive experience with infectious diseases, and he is the commander of a National Guard counter-bioterrorism unit. Pam Vukelic has a masters of science degree in home economics with an emphasis on textiles/clothing (Dr. McDonough promoted her to be the director of the Disease Control Division when he was the chief of the Preventive Health Section). Larry Shireley's professional and educational qualifications are far superior for this position. Also, we were experiencing communication problems between the state epidemiologist and the division. Pam Vukelic had denied the state epidemiologist access to necessary records, had denied secretarial support to the state epidemiologist, had directed the Disease Control staff to not freely communicate with the state epidemiologist, and had directed the state epidemiologist to not freely communicate with the Disease Control staff. The reassignment addressed those organizational issues.

Sagsveen distributed copies of this letter to physicians, legislators, and health department officials. Sagsveen also sent a copy to the Bismarck Tribune and the letter was published in the newspaper. Following the publication of the letter in the Tribune, Vukelic immediately contacted Sagsveen and requested a retraction but that request was denied. Sagsveen admitted that he never spoke to Vukelic about the accusations made against her in the July 3, 2000, letter. See Deposition of Sagsveen, pp. 194, 196.

On June 22, 2000, Vukelic had submitted an application for a teaching position at Bismarck High School. Vukelic returned from her paid administrative leave on July 5, 2000. On July 11, 2000, Vukelic accepted a teaching position that had been offered to her by the Bismarck School District. Vukelic submitted a letter of resignation on August 15, 2000, to take a full-time position with the School District effective August 24, 2000. According to Sagsveen, he had proposed that Vukelic assume responsibility for working on the state tobacco programs to develop plans for the utilization of the millions of dollars the state had received from a nationwide settlement in November 1998. See Depo-

sition of Sagsveen, pp. 201–207. Vukelic's new position was to be entitled Community Health Grant Program Coordinator. Id, p. 208. Sagsveen contends that Vukelic wanted her job back as the Director of the Division of Disease Control and nothing less. See Deposition of Sagsveen, p. 200. Vukelic contends that although she was still working as a full-time employee at the Health Department, she had been given no meaningful job tasks or assignments.

## III. LEGAL DISCUSSION

### A. STANDARD OF REVIEW

The Court will grant a motion for summary judgment only if the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); see also *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must resolve all ambiguities and draw all reasonable inferences in the plaintiff's favor. *Id.* If the defendants can show that there is no issue of material fact, then the plaintiff must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see also *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. A mere trace of evidence supporting the plaintiff's position is insufficient—the facts must generate evidence from which a jury could reasonably find for the plaintiff. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. SECTION 1983 CLAIMS

■ 42 U.S.C. Section 1983 authorizes damage suits against "persons" for deprivation of federal rights under color of state law. Section 1983 provides in relevant part as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in the action at law, suit in equity, or other property proceeding for redress. . . .

42 U.S.C. § 1983. It is well-established that neither a State nor its officials acting in their official capacities are "persons" under Section 1983. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). However, state officials acting in their individual capacities are amenable to suit under Section 1983. *Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

■ The Defendants maintain that they are immune from suit in their individual capacities based upon the doctrine of qualified immunity. Qualified immunity shields state officials from civil liability when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Holloway v. Reeves,* 277 F.3d 1035, 1037 (8th Cir.2002) citing *Doe v. Gooden,* 214 F.3d 952, 954 (8th Cir.2000). Qualified immunity is an affirmative defense for which the defendant carries the burden of proof. See *Sparr v. Ward,* 306 F.3d 589, 593 (8th Cir.2002) (explaining that it is still incumbent on the plaintiff to show that the law the defendant allegedly violated is clearly established).

■ The purpose of qualified immunity is to allow public officials to perform their duties in a manner they believe to be correct without fear for their own financial well being. "An official loses immunity if the law he violated was clearly established at the time of the violation, and the applicability of the law to his particular action

was evident." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In other words, the qualified immunity defense fails if the official violates a clearly established constitutional or statutory right of which a reasonable person would have known. The validity of a qualified immunity defense depends not on whether a defendant acted wrongly, but whether a reasonable person would know that their actions deprived another of a known and clearly established constitutional or statutory right. The contours of a right must be sufficiently clear so that a reasonable official would understand that what he or she is doing violates that right before a defense of qualified immunity is unavailable. *Holloway v. Reeves,* 277 F.3d 1035, 1037 (8th Cir.2002).

The touchstone of qualified immunity is objective reasonableness. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Thus, the appropriate inquiry is whether objectively it would be clear to all reasonable officials that the actions taken were unlawful under the situation the official faced, without any reference to the official's subjective motivations. *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

## C. FIRST AMENDMENT CLAIMS

Vukelic contends she was deprived of her First Amendment rights of free speech by the defendants because they retaliated against her for speaking out on Health Department matters. To establish a prima facie case of unlawful retaliation, Vukelic must show that she participated in a protected activity; that the defendants took adverse employment action against her; and that a causal connection existed between the speech protected by the First Amendment (the protected activity) and the adverse employment action. See *Hudson v. Norris,* 227 F.3d 1047, 1050–51 (8th

Cir.2000). Once the plaintiff establishes a prima facie case, the burden then shifts to the defendants to articulate a non-discriminatory reason for the adverse employment action. If that burden is met, the plaintiff then has a chance to prove that the reason(s) proffered by the defendants were pretextual. *Id.*

In determining whether Vukelic's speech qualified for First Amendment protection, the Court must first assess whether the speech at issue could be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If so, the Court must balance the plaintiff's right to comment on a matter of public concern with the defendants' interest in promoting departmental efficiency. *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). This determination is a question of law for the Court to resolve. In other words, Vukelic must first establish that her speech addressed matters of public concern which is a question of law for the Court to resolve rather than a question of fact for the jury.

It is well-settled that matters of public concern are those matters of political, social, or other concern to the community. *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708. Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement as revealed by the entire record. *Id.* at 147–48, 103 S.Ct. 1684. Although the content of the speech must be of public importance, the focus is not on the public interest in the speech's topic, but rather the employee's role in conveying the speech. As the court in *Terrell v. University of Tex. Sys. Police,* 792 F.2d 1360, 1362 (5th Cir.1986) explained:

In determining whether a particular speech or writing addressed a matter of public concern, we must decide whether the plaintiff was deprived of fundamental rights by virtue of working for the Government. Because almost anything that occurs within a public agency could be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee. Rather, our task is to decide whether the speech at issue in a particular case was made primarily in the plaintiff's role as citizen or primarily in his role as employee. In making this determination, the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment.

■■■■■ It is generally accepted that speech regarding the use of public funds touches on a matter of public concern. *Belk v. City of Eldon*, 228 F.3d 872, 878 (8th Cir.2000). It is also accepted that criticism of a public employer in his or her capacity as a public official touches on matters of public concern. *Id.* Finally, while not dispositive, a heightened public interest in a particular issue may also serve as an indicator that an issue is one of public concern.

■■■■■ That being said, not all job-related utterances by a public employee address matters of public concern. See *Sparr v. Ward*, 306 F.3d 589, 594 (8th Cir.2002). "It is not enough that the topic of an employee's speech is one in which the public might have an interest." *Id.* The Court "must determine whether the purpose of the speech was to raise issues of public concern or to further the employee's private interests." *Id.* In other words, an employee's speech does not fall under the protection of the First Amendment unless the employee is speaking out as a concerned citizen, and not just as an employee. Only if a speech meets this standard

does the Court then engage in the balancing inquiries required by Connick–Pickering.

■■■■■ In this case, Vukelic contends that her speech with respect to the Rod Gilmore disciplinary incident touched on the misuse of public funds and, therefore, addressed a matter of public concern. However, Vukelic has not explained how her reassignment within the Health Department in May 2000 was causally connected to this disciplinary incident. More important, Vukelic has not cited to any protected "speech" or activity or comments of any sort on her part with respect to Gilmore's suspension without pay which resulted in any retaliatory action being taken against her by Sagsveen or Bartz. Vukelic may have privately questioned Sagsveen's reversal of her decision to suspend Gilmore without pay for 30 days, but Vukelic admitted during her deposition that she had never spoke with Sagsveen or otherwise vocalized any misgivings about his actions to overturn the suspension. See Deposition of Vukelic, pp. 206–207. This was also confirmed by Sagsveen. In other words, there was never any "speech" or commentary of any sort on Vukelic's part that occurred that would trigger any right to First Amendment protection.

■■■■■ Vukelic also argues that the rumors of an interoffice relationship between Sagsveen and Knudson Buresh was a matter of public concern and that her speech addressing rumors of the inappropriate relationship was protected under the First Amendment. For support, Vukelic relies upon the holding in *Belk v. City of Eldon*, 228 F.3d 872 (8th Cir.2000). However, any reliance on Belk is misplaced as it does not support the proposition that statements regarding a superior's extramarital affair are protected speech per se. Further, Belk is readily distinguishable from this case.

In Belk, the plaintiff told others of her supervisor's rumored extramarital affair with a co-worker who was receiving benefits inappropriate to her employment status. The Eighth Circuit concluded on appeal that the plaintiff's statements about the extramarital affair, while in poor taste, were protected speech because they provided a potential explanation for the alleged misuse of public funds by the plaintiff's supervisor.

In this case, Vukelic has not established any connection between Sagsveen's alleged interoffice relationship and a misuse of his public position or a misuse of public funds. Vukelic's allegations regarding the misuse of public funds relate solely to the Gilmore suspension incident and not to any alleged improprieties between Sagsveen and Knudson Buresh. More important, Vukelic failed to identify any statements (protected speech) that she had ever made about the purported affair. Aside from privately acknowledging to Sagsveen in December 1998 that she had heard of the rumors, Vukelic has vehemently denied that she ever spoke out or otherwise took any interest in Sagsveen's alleged relationship with Knudson–Buresh. See Deposition of Vukelic, p. 203. Simply stated, there has been no protected "speech" activity nor any speech on a matter of public concern and Vukelic, by her own admission, never spoke of the alleged interoffice relationship.

Next, Vukelic contends that her opinions regarding the manner in which Sagsveen handled the disclosure of protected health information that had been published in the New England Journal of Medicine may have contributed to her reassignment. Assuming that the manner in which Sagsveen dealt with this disclosure was a matter of public concern, there is nothing established in the record to demonstrate that Vukelic voiced her concerns, shared her opinions, or otherwise engaged in any protected speech activity with respect to Sagsveen's handling of the matter or his decision to implement a new multi-step review procedure. In other words, there has been no protected speech activity nor any speech on a matter of public concern as it relates to this matter. More important, because Vukelic did not engage in any apparent speech activity that was a matter of public concern, it stands to reason that a reasonable person in the position of the defendants would not have been aware that any of their conduct violated clearly established statutory or constitutional rights.

■■■ Finally, Vukelic suggests that her comments with respect to a letter sent to Sagsveen from Representative Rod Froelich constituted protected speech. As previously noted, on May 2, 2000, Sagsveen had received a letter from Representative Froelich that was critical of the manner in which Vukelic managed her department. The record reveals that Vukelic was never informed of the letter nor given an opportunity to respond to the criticisms. Vukelic was upset and dissatisfied with Sagsveen's response to her and she proceeded to initiate her own investigation into the allegations of wrongdoing. It appears that any comments that were made by Vukelic to such criticisms were done so in Vukelic's capacity as an employee and were motivated by, and in response to, the personal criticisms leveled at her by Representative Froelich. As such, her comments were clearly not intended to address a matter of public concern but instead were clearly her personal responses to the personal criticisms leveled against her.

The same can be said with respect to any comments made by Vukelic to Sagsveen and Bartz following her reassignment on May 31, 2000. Such comments were clearly made in furtherance of Vukelic's private interests in retaining her position as Director of the Division of Disease

Control as opposed to some altruistic purpose. The fact that Vukelic's plight gained extensive media attention is insufficient to elevate her speech to a matter of public concern. The "speech" of Vukelic was job related and/or related to the employee's private interests and clearly did not raise issues of public concern. As a result, any such speech does not fall under the protection of the First Amendment.

■ In summary, Vukelic has not identified any specific protected speech activity that rises to the level of a First Amendment claim. None of the matters referenced above that are relied upon to support the First Amendment claims passes the Connick–Pickering public concern requirement. Vukelic's assertions that she "disagreed" with or was "concerned" about the manner in which State Health Officer Sagsveen ran the Health Department are insufficient as a matter of law. In most instances, Vukelic by her own admission never engaged in any speech activity. And when she did speak out, it was in her capacity as an employee and in furtherance of her private interests in that capacity rather than raising issues of public concern.

Although the defendants carry the burden of proof with respect to their defense of qualified immunity, it is still incumbent upon the plaintiff to present evidence to show that the law the defendants allegedly violated is a clearly established statutory or constitutional right. *Sparr v. Ward,* 306 F.3d 589, 594 (8th Cir.2002). The plaintiff has made no such showing with respect to her First Amendment claims which dispenses with the need to address the second inquiry mandated by Connick Pickering. See *Mustafa v. State of Neb.,* 196 F.Supp.2d 945, 958 (D.Neb.2002) (finding no need to do a balancing of the interests when the speech is not about a matter of public concern). Further, the plaintiff has failed to establish a prima facie case of

unlawful retaliation under the current law of the Eighth Circuit. See *Hudson v. Norris,* 227 F.3d 1047 (8th Cir.2000).

■ In summary, when a public employee speaks not as a citizen upon matters of public concern but instead as an employee upon matters of personal interest, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision. The definition of what constitutes a matter of public concern must be constrained by the common-sense realization that government offices such as the State Health Department could not function if every employment decision and personnel dispute became a constitutional matter.

## D. DUE PROCESS CLAIMS

Vukelic also contends that the defendants violated her rights protected by the Fourteenth Amendment's due process clause. The due process clause has two components; namely, procedural due process and the substantive due process. *Singleton v. Cecil,* 176 F.3d 419, 424 (8th Cir.1999). Vukelic does not specify in her complaint whether she is claiming a violation of her substantive or procedural due process rights. It does not appear that she is contending there was a substantive due process violation. Nevertheless, the Court will examine both claims.

### 1) SUBSTANTIVE DUE PROCESS

■ Substantive due process "specifically protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nations's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *de Llano v. Berglund,* 142 F.Supp.2d 1165, 1169 (D.N.D.2001) quoting *Singleton v. Cecil,* 176 F.3d 419, 424 (8th Cir.1999). Substantive due process has generally been limited to matters relating to marriage,

procreation, and the right to bodily integrity. See *Abeyta By and Through Martinez v. Chama Valley Independent School Distr., No. 19,* 77 F.3d 1253, 1257 (10th Cir.1996) citing *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). The United States Supreme Court has, as a general rule, been unwilling to expand the concept of substantive due process beyond these core areas.

■ In this case, Vukelic has not made even a general claim of a substantive due process violation nor does it appear that there is a basis for such a claim under the current state of the law in the Eighth Circuit. Any alleged claim of a substantive due process violation simply lacks the specificity required to overcome the defendants' defense of qualified immunity. See *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Further, Vukelic has not presented any evidence, nor made any legal argument, that the defendants have deprived her of a clearly established constitutional or statutory right of which a reasonable person would have known. It is well-established that state-created employment relationships or contract rights do not generally warrant substantive due process protection. See *de Llano v. Berglund,* 142 F.Supp.2d, 1165, 1169 (D.N.D.2001); see *Singleton v. Cecil,* 176 F.3d 419, 425–26 (8th Cir.1999). As such, any claim of a substantive due process violation is devoid of merit.

2) PROCEDURAL DUE PROCESS

■ A procedural due process claim is different from a substantive due process claim. See *de Llano v. Berglund,* 142 F.Supp.2d 1165, 1169. To assert a procedural due process claim, Vukelic must initially demonstrate that she was deprived of a life, liberty, or property interest without sufficient process. *Krentz*

*v. Robertson,* 228 F.3d 897, 903 (8th Cir. 2000). The property right at issue in a procedural due process claim must derive from an independent source, such as state law, while the amount of process that is due is judged in reference to the federal Constitution. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Riggins v. Board of Regents of the University of Nebraska,* 790 F.2d 707, 710 (8th Cir.1986). "For a property interest to arise, a government employee must have a 'legitimate claim of entitlement' to continued employment, as opposed to a mere subjective expectancy." *Batra v. Board of Regents of University of Nebraska,* 79 F.3d 717, 720 (8th Cir.1996).

The defendants do not dispute that Vukelic had a property interest in her job. Rather, they focus on the process that was available to Vukelic. As previously noted, although the property right must derive from state law, the process that was due the employee is judged by reference to the federal Constitution. Thus, assuming that Vukelic had a property interest in her job that would trigger procedural due process protections, the critical issue is whether Vukelic received the process to which she was due under federal law.

The record reveals that Vukelic contacted Sagsveen following her reassignment on May 31, 2000, to request an immediate reinstatement to her former position. Vukelic also contacted the North Dakota Public Employees Association who filed a grievance against the Health Department on her behalf. Sagsveen subsequently denied Vukelic's request for reinstatement and took the position that Vukelic's reassignment was not a grievable action under state law because her personnel action was considered a reassignment as opposed to a demotion.[1]

1. State law provides that employees can

grieve an employer action of demotion, dis-

The defendants argue that Vukelic cannot sustain her procedural due process claim because she failed to invoke the due process available to her under state law. In response, Vukelic states that she did attempt to invoke the statewide appeals mechanism with respect to her "reassignment," but that under current personnel procedures and administrative rules she was unable to grieve this particular employment action.

North Dakota has established a statewide appeals mechanism to address regular employee grievances. See N.D. Cent. Code § 54–44.3–12.2. North Dakota's Personnel Board is authorized to

"hear, consider, and determine appeals by nonprobationary employees in the classified service from agency grievance procedures under section 54–44.3–12.2 related to position classifications, pay grade assignments, merit system qualification, discrimination, reprisals, reduction-in-force, forced relocation, demotion with loss of pay, suspension without pay, and dismissal. The board may assign the initial hearing of an appeal to an administrative hearing officer for the receipt of evidence and the preparation of findings of fact, conclusions of law, and a recommended decision under chapter 28–32 [of the North Dakota Century Code]. The board's decision on an appeal shall resolve the issues presented between the employer and employee, and the board may order any needed remedy, including affirming, modifying, or reversing the employer's decision, vacating suspensions, directing back pay and ad-

justments to back pay, and reinstatement to the classified service."

*Berger v. State Personnel Bd.*, 502 N.W.2d 539, 541 (1993) (emphasis added). Thus, under state law, Vukelic had the opportunity to appeal her position classification; her reassignment on May 31, 2000; or the reprisals and/or forced relocation in June–July 2000 by Sagsveen.

Following her reassignment, the evidence has established that Vukelic did immediately file a grievance with the Health Department. However, Vukelic never invoked the state-wide appeal mechanism following Sagsveen's denial of her grievance. Vukelic argues that she is not required to exhaust her administrative remedies before pursuing a claim under 42 U.S.C. § 1983. However, such an assertion is problematic given the circumstances of this case and the legal theories or claims being pursued. In essence, Vukelic is contending that she was denied adequate procedural due process and yet it is undisputed that she failed to utilize the procedural due process that was available to her under state law. The due process procedures available to Vukelic cannot be considered constitutionally inadequate unless and until she has attempted to exercise the process available to her.

 The essential requirements of due process are notice and an opportunity to be heard. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Irrespective of the due process rights that Vukelic enjoys under state law, she is entitled to notice of the reason(s) for her reassign-

missal, suspension without pay, forced relocation, reduction-in-force, reprisal, or discrimination in employment. N.D. Cent.Code § 54–44.3–12.2, N.D.Admin.Code § 4–07–20–02. Demotion, as defined by the North Dakota Administrative Code, means "an involuntary reduction in the base salary of a regular employee resulting from reassignment for cause

to a position in a lower class." N.D. Admin Code § 4–07–19–2(2). The undisputed evidence discloses that although Vukelic was reassigned, her salary and benefits remained the same. Thus, Sagsveen did not consider Vukelic's personnel action to be a demotion or a grievable action.

ment and an opportunity to be heard. Those due process rights were available under the state-wide appeals mechanism found at Section 54–44.3–12.2 of the North Dakota Century Code. Vukelic was entitled to the essential requirements of due process and failed to take any steps to invoke the appeal procedure for reasons which are unclear from the record. Sagsveen expressed the opinion that her reassignment was not grievable. However, both that decision and the underlying grievance initially filed by Vukelic are matters that could have been appealed and considered under Section 54–44.3–12.2. Vukelic cannot claim to have been denied an opportunity to be heard until she has first asked to be heard, which never occurred.

In a procedural due process claim, the focus is not on whether an individual has been denied a constitutionally protected interest for unfair, improper, and otherwise wrongful reasons. Rather, the focus is on the adequacy of the state procedures in place for the protection of such interests. See *Strasburger v. Board of Education,* 143 F.3d 351, 358 (7th Cir. 1998). Vukelic failed to invoke the process provided for by the State after her voluntary resignation and/or constructive discharge on August 15, 2000. She also failed to invoke any process through the state-wide appeals mechanism that was designed to address "position classifications" or reclassifications. Vukelic cannot assert that she did not receive due process when she failed to invoke the process available. There were adequate state remedies available under North Dakota law to address Vukelic's concerns but they were never utilized. It is well-established that so long as there are adequate state procedures available in which the employee can seek redress, due process is satisfied. See *McDaniels v. Flick,* 59 F.3d 446 (3rd Cir. 1995). The Court concludes that there

were adequate state procedures available in this case.

Vukelic also alleges in her complaint that Sagsveen defamed her in the letter he distributed to the various health departments, physicians, and state legislators on or about July 3, 2000. She maintains that her reputation was injured and she that became the object of ridicule, contempt, and hatred on account of Sagsveen's actions. Vukelic argues that she was deprived of a liberty interest in her good name and reputation without due process of law.

The Supreme Court has recognized a potential liberty interest when an individual's good name, reputation, honor, or integrity is at stake because of what the government is doing to him or her. *Mustafa v. State of Neb. Dept. of Correctional Services,* 196 F.Supp.2d 945, 960 (D.Neb. 2002). For purposes of a due process claim, defamation occurs when a state official publicly levels untrue charges against an individual, seriously damages his or her standing in the community, or forecloses any chance for other employment opportunities. *Mascho, Jr. v. Gee,* 24 F.3d 1037, 1039 (8th Cir.1994). "An employee's liberty interest is implicated where the employer levels accusations at the employee that are so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges." *Shands v. City of Kennett,* 993 F.2d 1337, 1347 (8th Cir. 1993).

To establish a constitutional claim, a plaintiff must prove (1) defamation by a state official and (2) a "tangible alteration" of a legal right or status such as the loss of future employment. *Mustafa v. State of Neb. Dept. of Correctional Services,* 196 F.Supp.2d 945, 960 (D.Neb.2002) citing *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); see also *Green v.*

*DeCamp,* 612 F.2d 368, 370 (8th Cir.1980) (acknowledging that stigma to one's reputation alone was not a property or liberty interest protected by the Fourteenth Amendment). Given this standard, the Court concludes that Vukelic's due process claim fails with respect to an alleged deprivation of a liberty interest.

It is well-settled that allegations of unsatisfactory job performance or general misconduct are insufficient to create a stigma that implicates an employee's liberty interest in her reputation. *Mascho v. Gee,* 24 F.3d 1037, 1039 (8th Cir.1994). For example, in *Robinson v. City of Montgomery City,* 809 F.2d 1355 (8th Cir. 1987), the Eighth Circuit held that a city press release was insufficiently stigmatizing to implicate the liberty interests of a discharged police chief where the press release indicated that the city was dissatisfied with the chief's performance. Similarly, in *Shands v. City of Kennett,* 993 F.2d 1337, 1347 (8th Cir.1993), the court held that general allegations of insubordination or misconduct do not rise to the level of constitutional stigma.

In this case, Sagsveen sent out a letter which essentially charged Vukelic with obstructing the State Epidemiologist efforts to access information and support from the Division of Disease Control. Sagsveen also charged Vukelic with threatening her colleagues with insubordination. Without addressing the truthfulness of Sagsveen's charges, the Court concludes as a matter of law that such statements do not rise to the level of constitutional stigma. There is nothing to suggest that Vukelic suffered a "tangible alteration" of a legal right or status in light of Sagsveen's comments. Vukelic retained her full-time, salaried position at the Health Department following the publication of the July 3, 2000, Sagsveen letter. She was able to secure other full-time, professional employment within a few weeks after the dissemination of the letter, i.e., Vukelic accepted a teaching position on July 11, 2000. The Sagsveen letter essentially contains general allegations of unsatisfactory job performance or misconduct that the Eighth Circuit has previously recognized as insufficient as a matter of law to implicate the Fourteenth Amendment.

Unfortunately, it is clear that all parties to this lawsuit dug in their heels at times and became involved in a public campaign to "bad mouth" the other with little forethought or effort to communicate beforehand in any meaningful manner. It is readily apparent from the record that the Health Department was in a state of disarray from 1999–2000. The Health Department, by Sagsveen's own admission, was in "turmoil". See Deposition of Sagsveen, p. 57. There was extremely poor, and often non-existent, communications between the State Health Officer and many of the upper level supervisors and directors. The directors or "chiefs" that reported directly to Sagsveen often failed to engage in any meaningful communications with Vukelic and others in similar supervisory positions concerning the efforts to reorganize the Health Department.

The record clearly establishes that Pam Vukelic had been an excellent employee at the Health Department for years and had received very favorable annual evaluations. She was a valued state employee who was well-liked by her staff. The change in the Health Department organizational structure created a litany of serious personnel problems and a heightened level of uncertainty among the employees. Many of the Health Department employees were polarized by the hurried decisions of upper management. The record reveals many rash and apparently ill-advised decisions made concerning the reorganization and staff reassignments. There were many resignations, reassignments, and realloca-

tions of job duties within the Health Department, in 1999–2000, often with virtually no meaningful communication between those making the decisions and those employees directly effected by the decisions. However, none of the many letters, memos, e-mails, press releases, or public discussions of their dislikes for each other by Sagsveen and Vukelic would trigger the Fourteenth Amendment. Simply stated, the "turmoil", the ill-advised decisions that plagued the Health Department in 1999–2000, and the resulting personnel problems do not trigger violations of clearly established constitutional rights that warrant the need for the federal court to intervene and exercise jurisdiction.

The record is devoid of facts which reveal that the defendants violated a clearly established constitutional or statutory right of which a reasonable person would have known. As such, the defense of qualified immunity shields the defendants from civil liability.

### E. STATE CLAIMS

Finally, in addition to the alleged violations of the First and Fourteenth Amendment rights, Vukelic has asserted several common law tort claims under state law. Her complaint encompasses claims of constructive discharge, defamation, and intentional/reckless infliction of emotional distress.

The plaintiff cites to 28 U.S.C. § 1367(a) as the jurisdictional basis for her state claims. Section 1367(a) provides district courts with supplemental jurisdiction over all other claims that are so related to any federal question claims in the action that they form part of the same case or controversy. 28 U.S.C. § 1367(a). However, as discussed above, Vukelic cannot sustain her claims involving a federal question.

■■ The parties have not raised any jurisdictional issues with the Court. Nevertheless, the Court is required to raise jurisdictional issues sua sponte when there is an indication that jurisdiction is lacking. See *Krein v. Norris*, 250 F.3d 1184, 1187 (8th Cir.2001). In this case, the Court's jurisdiction over Vukelic's state claims is predicated on her ability to sustain her claims involving a federal question. 28 U.S.C. § 1367(a). Because the plaintiff cannot sustain her federal constitutional claims, the Court does not possess jurisdiction over the state claims. As a result, it would be inappropriate for the Court to address the merits of the state claims.

### IV. CONCLUSION

■■ For the reasons outlined above, the Court concludes, as a matter of law, that the plaintiff's claims of First and Fourteenth Amendment violations must fail. The plaintiff's speech activities do not pass the Connick–Pickering public concern inquiry. Further, the evidence has established that the plaintiff was afforded adequate notice and an opportunity to be heard as required by federal law but chose not to avail herself of the due process procedures that existed. Even viewing the facts and evidence presented in a light most favorable for the plaintiff, the record reveals that summary judgment as a matter of law is appropriate on the federal claims. The federal court is simply not the appropriate forum in which to review the multitude of personnel decisions that are made daily by state agencies and in this particular case, the decisions made by the State Health Officer. As the United States Supreme Court said in *Bishop v. Wood*, 426 U.S. 341, 349–350, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), "We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error.... The Due Process Clause of the Fourteenth Amend-

ment is not a guarantee against incorrect or ill-advised personnel decisions."

For the reasons set forth above, the Court GRANTS the defendants' motion for dismissal (Docket No. 16) with respect to the 42 U.S.C. § 1983 claims alleging violations of the First and Fourteenth Amendments. The Court dismisses the plaintiff's state tort claims on its own motion without prejudice for lack of jurisdiction.

IT IS SO ORDERED.