**Jendra LOEFFELMAN,
Plaintiff/Appellant,**

v.

**BOARD OF EDUCATION OF THE CRYSTAL CITY SCHOOL DISTRICT, Defendant/Respondent.**

**No. ED 83337.**

Missouri Court of Appeals,
Eastern District,
Division Five.

Feb. 24, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 14, 2004.

Charles Lloyd Ford, Clayton, MO, for appellant.

Maurice Alvin Watson, Hayley Elizabeth Hanson, Co–Counsel, Kansas City, MO, for respondent.

SHERRI B. SULLIVAN, Chief Judge.

### Introduction

Jendra Loeffelman (Teacher) appeals from the judgment of the trial court upholding the decision of the Board of Education of the Crystal City School District (the Board) terminating her indefinite contract as a permanent teacher with the Crystal City School District (the School District) pursuant to Section 168.114 [1] of the Teacher Tenure Act (the Act), Sections 168.102 to 168.130. Teacher argues that she did not willfully violate Board policies and that her classroom comments regarding interracial relationships and biracial children were protected by the First Amendment, and therefore her contract should not have been terminated. We affirm.

### Factual and Procedural Background

We consider the evidence and all reasonable inferences therefrom in a light most favorable to the Board's decision. *Gerig v. Bd. of Educ. of the Cent. Sch. Dist., R–III,* 841 S.W.2d 731, 732 (Mo.App. E.D.1992). The School District first employed Teacher for the 1990–1991 school year, and the School District has continuously employed her as a teacher since that time. In August 1996, Teacher entered into an indefi-

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

nite contract with the School District.[2] The contract states in relevant part:

> The teacher is subject to and agrees to comply at all times with all of the provisions, duties and requirements applicable to his or her position as directed by the superintendent or the teacher's immediate supervisor, and as stated in any applicable written performance standards or criteria, policies, rules and regulations of the district, whether adopted or modified before or after the effective date of this contract. The teacher acknowledges access to complete copies of all such performance standards or criteria, policies, rules and regulations and will be furnished with such copies as well as interpretations or explanations regarding the same upon request.

In May 2002, Teacher signed an addendum to the indefinite contract setting out her salary for the 2002–2003 school year. Teacher also entered into a contract with the School District to provide "extra duties" during the 2002–2003 school year. The "extra duties" contract states in relevant part:

> The Teacher is subject to and agrees to comply at all times with all of the provisions, duties and requirements applicable to the performance of such extra duties as directed by the Superintendent or the Teacher's immediate supervisor, and as stated in any applicable job description, written policies, rules and regulations of the district, whether adopted or modified before or after the effective date of this contract. The Teacher acknowledges access to copies of all such job descriptions, policies, rules and regulations.

During the 2002–2003 school year, Teacher taught eighth grade English at Crystal City Elementary School in the School District. On October 23, 2002, during Teacher's second period class, an African–American student, Student O.W., posed a series of questions to Teacher.[3] Included among the questions was one asking Teacher her personal opinion regarding abortion.[4] Teacher indicated that the question was not an easy one to answer "yes" or "no." Rather, it would depend upon the circumstances.

Following the question on abortion, Student O.W. asked Teacher if she was for or against interracial relationships.[5] Teacher's willing response was to the effect: "Oh, that's an easy one. I'm totally against it." Student O.W. pursued the issue asking something to the effect: "But what if the two are in love?" Again,

---

2. The Act defines an "indefinite contract" as every contract entered into between a school district and a permanent teacher. Section 168.104(3). The Act defines a "permanent teacher" in relevant part as any teacher who has been employed as a teacher in the same school district for five successive years and who continues to be employed as a teacher by the school district. Section 168.104(4). An indefinite contract continues in effect for an indefinite period, subject only to, as relevant here, termination by the Board after a hearing as provided under the Act. Section 168.106(5).

3. The questions occurred about twenty minutes into the class period. The questions stemmed from an assignment in another class in which the students were to choose topics on which to write opinion papers. However, no testimony indicated that part of the assignment included conducting a survey or polling individuals as to their personal beliefs about the topic. Rather, the students were to write papers expressing their own views on their chosen topic.

4. On previous occasions throughout Teacher's career, students have asked her personal opinion on topics, but Teacher had declined to respond.

5. Student O.W. had asked other teachers the same question, but they had not answered.

Teacher's willing response was to the effect: "Well, then, they should not have children." Some students testified that Teacher said interracial couples should be "fixed" so that they cannot have children and that "mixed children" are "racially confused."

Teacher's comments were heard by Student B.B., a biracial student sitting across the room from Student O.W., and Student R.S., another biracial student sitting about 20 feet from Student O.W. Student R.S. believed that Teacher was looking at her when Teacher responded to Student O.W.'s question and that Teacher's comments were directed toward her. Student R.S. also testified that Teacher stated that "mixed children" are "dirty." Teacher was aware of at least one biracial student in the classroom at the time of her comments.

Teacher explained that the rationale behind her comments was that she had observed children of interracial parents being teased.[6] Teacher also had observed children being teased for other reasons, such as disability, being a "slow learner," hair color, or just being "different." However, it was only for interracial relationships that Teacher advocated taking measures to prevent children, not for other types of relationships that may result in children who are teased for other reasons.

Later that day, Teacher willingly spoke with Mrs. G.B., Student B.B.'s mother. During their telephone conversation, Teacher stated that she opposed interracial relationships and that whites should marry whites and blacks should marry blacks. Teacher also stated that a female in an interracial relationship should have

herself "fixed" so that she cannot have children. Teacher further stated that biracial children come to school with "dirty little faces and their hair never combed properly" and that they are "misfortunate" and never accepted by society.

The next day, Teacher met with the Superintendent of the School District and the Principal of the Elementary School and informed them that some students may try to "twist" her words around from the previous day in the classroom.

Subsequently, the Superintendent of the School District presented Teacher with a letter placing her on paid administrative leave. The letter stated that Teacher would remain on paid administrative leave pending an investigation into allegations that Teacher made inappropriate, unprofessional, and discriminatory remarks during class on October 23, 2002.

On December 4, 2002, the Superintendent of the School District sent, via certified mail and personal service, to Teacher a notice of termination and right to a hearing. The notice stated that based on its investigation into allegations that Teacher made racially discriminatory comments, the School District concluded that Teacher "willfully violated and failed to obey the laws of the State of Missouri and the published policies and regulations of the Board of Directors." Because of such misconduct, the School District intended to move for termination of Teacher's indefinite contract with the Board. Attached to the notice was a Statement of Charges setting forth with particularity the alleged grounds for termination of Teacher's indefinite contract. The Statement of Charges identified four Board policies allegedly violated by Teacher: Board Policy 0200;[7]

---

6. Teacher recalled only one biracial student that she had observed being teased three to four years earlier.

7. Board Policy 0200 sets out the Board's philosophy of education.

Board Policy 1300;[8] Board Policy 2100;[9] and Board Policy 2130.[10]

Teacher requested and the Board held a hearing on the charges against Teacher. Subsequently, the Board entered Findings of Fact and Conclusions of Law. The Board found that Teacher's comments to Student O.W. were: (1) race-based and constituted an instance of discriminating categorically on the basis of race; (2) not part of an objective classroom discussion; (3) expressing her personal views on the topic during class time; and (4) disparag-ing to biracial children, especially to the two biracial students who were in Teacher's classroom at the time of the comments and who heard the comments.

The Board concluded that it was without the authority to terminate the indefinite contract between Teacher and the School District based on a willful violation of or failure to obey Board Policy 0200 or Board Policy 2100.[11] However, the Board concluded that Teacher willfully violated Board Policy 1300 and Board Policy 2130 by her comments to Student O.W., within

---

**8.** Board Policy 1300 provides in relevant part:

> The District is committed to providing equal opportunity in all areas of recruiting, hiring, retention, promotion, and contracted service. The District further commits itself to the policy that there shall be no unlawful discrimination against any person because of race, color, religion, disability, age, gender, or national origin.
>
> The District's equal opportunity policy extends to prohibitions against harassment of students or employees because of the individual's race, color, religion, disability, age, gender, or national origin. This prohibition against harassment includes, but is not limited to, disparaging comments, written material, physical assaults, verbal threats, and offensive pranks.

**9.** Board Policy 2100 sets out a student's rights and responsibilities regarding equal educational opportunity.

**10.** Board Policy 2130 provides in relevant part:

> It is the policy of the District to maintain a learning environment that is free from harassment because of an individual's race, color, sex, national origin, ethnicity, disability, sexual orientation, or perceived sexual orientation. The School District prohibits any and all forms of unlawful harassment and discrimination because of race, color, sex, national origin, ethnicity, disability, sexual orientation, or perceived sexual orientation.
>
> It shall be a violation of District policy for any student, teacher, administrator, or other school personnel of this District to harass or unlawfully discriminate against a student through conduct of a sexual nature, or regarding race, color, national origin, ethnicity, disability, sexual orientation, or perceived sexual orientation as defined by this Policy.
>
> It shall also be a violation of District policy for any teacher, administrator, or other school personnel of this District to tolerate sexual harassment or harassment because of a student's race, color, national origin, ethnicity, disability, sexual orientation, or perceived sexual orientation, as defined by this Policy, by a student, teacher, administrator, other school personnel, or by any third parties who are participating in, observing, or otherwise engaged in activities, including sporting events and other extra-curricular activities, under the auspices of the School District.

**11.** Section 168.114 specifies the causes for which the Board may terminate an indefinite contract of a permanent teacher, including, as relevant here, for a willful violation of, or a failure to obey, the school laws of the state or the published regulations of the Board. Section 168.114.1(4). The Board concluded that because Board Policy 0200 is "descriptive and recommendatory, not prohibitory" and Board Policy 2100 is not "sufficiently prohibitory/mandatory," one cannot willfully violate nor fail to obey such regulations. *See Carter County Sch. Dist., R–1 v. Palmer*, 582 S.W.2d 347, 349–50 (Mo.App. S.D.1979) (holding that Section 168.114.1(4) does not allow termination on the basis of a regulation that neither forbids nor commands action). Therefore, the Board concluded that it was without authority to terminate Teacher's indefinite contract under these Board policies.

the hearing of other students, and by her comments to Mrs. G.B.

Accordingly, the Board entered its unanimous decision to terminate the indefinite contract between Teacher and the School District. Teacher sought judicial review of the Board's decision, and the trial court entered a judgment upholding the decision. Teacher appeals from the judgment.

### Standard of Review

■ We review the decision of the Board, an administrative agency, not the judgment of the trial court. *Gerig*, 841 S.W.2d at 733. Our review is limited to whether or not the Board's decision is supported by competent and substantial evidence on the whole record. *Id.* There is a strong presumption of validity in favor of the Board's decision and the presumption can only be overcome by a clear and convincing showing that the decision was arbitrary, capricious, unreasonable or an abuse of discretion. *Id.* The Board's decision cannot be reversed simply because we might have reached a different initial conclusion. *Id.* If evidence before the Board would warrant either of two opposed findings, we are bound by the administrative determination, and it is irrelevant that there is evidence to support a contrary finding. *Johnson v. Francis Howell R–3 Bd. of Educ.*, 868 S.W.2d 191, 195 (Mo. App. E.D.1994). We also defer to the Board's determination of the credibility of the witnesses. *Id.*

■ Our scope of review is less restricted when the Board's interpretation or application of a law or legal standard is challenged. *Gerig*, 841 S.W.2d at 733. In such a case, we may independently weigh the evidence and resolve factual issues, but in so doing we shall give due weight to the opportunity of the Board to observe the witnesses and to the expertness and experience of the Board. *Id.*

### Discussion

Teacher raises two points on appeal. In her first point, Teacher argues that the Board erred in terminating her indefinite contract with the School District because the record did not contain substantial and competent evidence showing that Teacher willfully violated Board Policy 1300 and Board Policy 2130.

■ Willfulness is seldom directly proved. *Burgess v. Ferguson Reorganized Sch. Dist., R–2*, 820 S.W.2d 651, 656 (Mo. App. E.D.1991). Under Section 168.114.1(4), willful has been interpreted as meaning "done deliberately; not accidental or without purpose; intentional," *Bd. of Educ., Mt. Vernon Sch., Mt. Vernon v. Shank*, 542 S.W.2d 779, 782 (Mo. banc 1976) (quoting Webster's Third New International Dictionary), or to act with the intention or purpose of violating or disobeying a regulation, *Carter County Sch. Dist., R–1 v. Palmer*, 582 S.W.2d 347, 349–50 (Mo.App. S.D.1979).

In *Burgess*, the court held that a willful violation of a school board regulation had occurred because the evidence showed that the teacher, an "experienced teacher" with almost ten years of experience, had knowledge of the policy and that the teacher executed a contract that specifically referred to school board policies. 820 S.W.2d at 657. The teacher received a copy of the school board's published policies and admitted reading them at the time she signed her contract. *Id.*

Similarly, in *Ortbals v. Special Sch. Dist. of St. Louis County*, 762 S.W.2d 437, 440 (Mo.App. E.D.1988), the court held that a willful violation of a school board regulation had occurred because the teacher admitted that she was aware the policy existed and that she had read and signed each of her previous employment contracts with

the school district, each of which incorporated all school board policies by reference.

By comparison, in *Palmer*, the court held that no willful violation of a school board regulation had occurred because "there was no evidence at all that appellant had ever read or had any knowledge of the regulations he is charged with having willfully disregarded. Much less is there any indication in the record that appellant acted with the intention to violate or fail to obey any regulation." 582 S.W.2d at 350.

■ There is no dispute that Teacher intended to act in that she willingly responded to Student O.W.'s questions. We also find sufficient evidence in the record supporting the Board's conclusion that Teacher's comments violated Board Policy 1300 and Board Policy 2130. The Board concluded, and we agree, that "making a statement regarding restricting marriage and/or a couple's ability to have children based solely on race is in and of itself discriminatory." [12] Further, Teacher's comments were "disparaging." To disparage is "to speak of or treat slightingly;" "to discredit; lower the estimation of." Random House Webster's College Dictionary 377 (2nd ed.1997).

We find particularly disturbing that Teacher was aware of at least one biracial student in the classroom at the time of her comments. Student R.S. testified that Teacher's comments made her feel sad and angry because she was not "racially confused" and had never been teased because she is biracial. Student R.S. also stated that based on Teacher's comments, she believes Teacher thinks she is inferior. Student B.B. testified that Teacher's comments made him feel upset, disappointed, and sad. The comments made him feel "out of place or different from everybody else" in his class. Both students also interpreted Teacher's comments as being racist.[13] Teacher testified that she made comments that the students considered racist and that hurt them. We note that the students generally respected Teacher before this incident.

Finally, we find sufficient evidence in the record supporting the Board's conclusion that Teacher's comments were a willful violation of Board Policy 1300 and Board Policy 2130. Regarding Teacher's knowledge of Board Policy 1300 and Board Policy 2130, the record revealed the following. Teacher was aware of a Board policy prohibiting harassment of students because of race. Prior to October 23, 2002, Teacher knew that teachers in the School District had an obligation to protect students from harassment or discrimination based on race and that students who engaged in such harassment or discrimination were subject to disciplinary action in accordance with School District policy. Teacher knew that the School District had a policy prohibiting students from harassing or discriminating against another student based on race and she would expect the School District to have a similar policy prohibiting teachers from the same conduct. Teacher acknowledged signing her indefinite contract and "extra duties" contract both of which included portions re-

---

**12.** The Board was guided by "the Webster's dictionary which defines 'discrimination' as 'the process by which two stimuli differing in some aspect are responded to differently,' and '3a: the act, practice, or *an instance of discriminating categorically rather than individually;* b: prejudiced or *prejudicial outlook,* ac-

tion, or treatment.' " (emphasis supplied by the Board).

**13.** We note that Teacher testified that she would not need a policy to tell her not to make comments in the classroom that students would view as racist.

ferring to Board policies and obligations associated therewith, as quoted above. Teacher knew that she was bound by the Board policies. Teacher stated that in previous years she had received written copies of the Board's policy manual, and that although the Board had ceased providing written copies of the manual to teachers, a copy could be accessed at the School District's database via a computer in Teacher's classroom. Teacher indicated that she had referred to written Board policy manuals in the past.

The Board found that Teacher "demonstrated a good working knowledge of Board policies and a demonstrated ability to access Board policies." The Board also found that together with her demonstrated working knowledge of Board policies, Teacher's "conduct in claiming that some students were likely to twist her words ... establishes that [Teacher] was aware that her remarks violated Board policy." We hold that the record supports the Board's findings and that the evidence is sufficient for the Board to have concluded that Teacher had knowledge of Board Policy 1300 and Board Policy 2130.

When viewing the evidence in the light most favorable to the Board's decision, we find competent and substantial evidence on the whole record to support the Board's conclusion that Teacher willfully violated Board Policy 1300 and Board Policy 2130. Therefore, under Section 168.114.1(4), the Board had authority to terminate the indefinite contract between Teacher and the School District. Although the Board might have chosen a lesser form of discipline, in light of Teacher's service to the School District, it was not required by law to do so. *Lacks v. Ferguson Reorganized Sch. Dist. R–2*, 147 F.3d 718, 722–23 (8th

Cir.1998). Accordingly, Teacher's point one on appeal is denied.

In her second point on appeal, Teacher argues that the Board erred in terminating her indefinite contract with the School District because her comments were protected by the First Amendment of the United States Constitution.[14]

We must affirm the decision of the Board unless the decision violates a constitutional provision. Section 536.140.2(1). To be protected by the First Amendment, a public school teacher's speech must address a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). A matter of public concern is a matter of political, social or other concern to the community. *Sparr v. Ward*, 306 F.3d 589, 594 (8th Cir.2002). To determine whether or not speech qualifies as a matter of public concern, we must examine the content, form and context of the speech, as revealed by the whole record. *Id.*

The Board found, and we agree, that Teacher's comments did not address a matter of public concern. Her comments expressed a private opinion regarding interracial relationships and biracial children. Her comments, responding to an eighth grade student's questions, occurred during class time when Teacher was supposed to be conducting her class. Her comments were not part of a lesson plan being conducted by Teacher nor did the opinion paper assignment from another class include conducting a survey or polling individuals as to their personal beliefs about the student's chosen topic. Further, the assignment was not to write a paper addressing society's views on a topic, as Teacher suggests, but rather to write a paper expressing the student's view on a

---

14. The First Amendment provides in relevant part that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I.

topic. Student O.W. asked Teacher her opinion because she "was curious." Several other students in the classroom heard Teacher's comments. Thus, because Teacher's comments did not address a matter of public concern, but rather a matter of private concern, they are not entitled to First Amendment protection.

 Even if we considered Teacher's comments a matter of public concern, a school board may still terminate the employment of a teacher if the interests of the school district in promoting the efficiency of the public services it performs through its employees outweigh the interests of the teacher in commenting on the matter. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Under the *Pickering* balancing test, the following factors are considered: (1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the employee and co-workers when the speech in question has caused or could cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties. *Lewis v. Harrison Sch. Dist. No. 1*, 805 F.2d 310, 315 (8th Cir.1986).

 The Board concluded that Teacher's comments "caused a serious disruption to the school setting." The record supports this conclusion. Greg Balmer (Balmer), administrative assistant to the Elementary School principal and an eighth grade social studies teacher, testified that a major change in the school's climate occurred after Teacher's comments. The students were agitated in the hallways, angry, upset, and some were a little frightened and very worried to attend Teacher's class again. Teachers also expressed concern to Balmer that students were not focusing on their studies and were asking many questions about the incident. Balmer stated that the incident disrupted the school for at least several weeks. Student R.S. testified that Teacher's comments had a lasting impact on her and other students at the school in that they "would never feel comfortable in her room with her again."

In addition to the school environment at large, Teacher's comments negatively affected the specific students involved in the incident. Along with the evidence cited above under our analysis of Teacher's point one on appeal, the record reveals the following. Mrs. G.B. testified that the "words [Teacher] said—my son truly believes that she believes, that a teacher that he looked up to, that was a very good teacher, that she really believed he should not have been born." Student B.B. stated that Teacher's comments distracted him from his schoolwork. Mrs. B.S., Student R.S.'s mother, testified that because of Teacher's comments, her daughter is "less sure of herself" in school and her self-esteem has been damaged. Mrs. B.S. also testified that her daughter was distracted by the incident, possibly affecting her grades, and she felt "on the spot" and defensive at school. Mrs. B.S. wanted "to make very sure that [her daughter] was not in [Teacher's] class anymore." Student O.W. stated that she would never be able to forget Teacher's comments. Teacher's comments irreparably damaged the student-teacher relationship by destroying her rapport with her students and thereby diminishing her ability to effectively teach her students.

Further, the evidence cited above under our *Connick* analysis also weighs in favor of the School District under our *Pickering* analysis. We need not repeat it here. Needless to say, the time, manner, place,

and context that Teacher chose to make her comments exhibits, to say the least, extremely poor judgment. The nature of her comments was obviously discriminatory, and therefore legally unacceptable. The School District's interest in efficiently operating a school that is free from race-based discriminatory speech outweighs any First Amendment right that Teacher may have to express her private opinion regarding interracial relationships and biracial children to her students.

Thus, because Teacher's comments addressed a matter of private concern, not of public concern, the Board had authority to terminate her employment without violating her rights under the First Amendment. Further, even if Teacher's comments addressed a matter of public concern, the School District's interests in promoting the efficiency of the public services it performs through its employees outweigh the interests of Teacher in commenting on interracial relationships and biracial children. Accordingly, Teacher's point two on appeal is denied.

## Conclusion

Teacher has not shown by clear and convincing evidence that the decision of the Board is arbitrary, capricious, unreasonable or an abuse of discretion nor has she shown that the decision violates a constitutional provision. Accordingly, the judgment of the trial court is affirmed.

MARY K. HOFF, J., and GEORGE W. DRAPER III, J., concur.