# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1369

_____

Linda Schilcher,                                        *
                                                        *
                  Appellee,                             *
                                                        *      Appeal from the United States
       v.                                               *      District Court for the
                                                        *      Western District of Arkansas.
University of Arkansas, Board of                        *
Trustees; Donald O. Pederson, Vice                      *           [PUBLISHED]
Chancellor of Academic Affairs;                         *
Bernard Madison, Dean of the                            *
College of Arts and Sciences;                           *
                                                        *
                  Appellants.                           *


_____

Submitted: January 16, 2004
Filed: November 5, 2004

_____

Before MELLOY, BRIGHT, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

       Donald Pederson and Bernard Madison–who were at the relevant times the Vice Chancellor of Academic Affairs at the University of Arkansas at Fayetteville and the Dean of its College of Arts and Sciences, respectively–along with the Board

of Trustees of the University of Arkansas, appeal from the district court's[1] denial of their summary judgment motion asserting qualified immunity. For the reasons discussed below, we affirm the portion of the district court's judgment that is reviewable in this appeal–the denial of qualified immunity–and we dismiss the remainder of the appeal for lack of jurisdiction.

I.

The following background information is taken from the record and is undisputed for purposes of this appeal. In the early 1990s, the country of Saudi Arabia donated approximately $20 million to the University of Arkansas at Fayetteville for a Middle East Studies Program. Linda Schilcher was at that time a tenured associate professor in the History Department at Villanova University in Pennsylvania. She had teaching and research duties at Villanova's Center for Contemporary Arab and Islamic Studies. Schilcher applied to be a tenure-track associate professor in the History Department at the College of Arts and Sciences at the University of Arkansas at Fayetteville with teaching and research duties in the Middle East Studies Program. She was hired, and she began teaching in the 1995-96 academic year. On the recommendations of the History Department, the College of Arts and Sciences reappointed her for the 1996-97 and 1997-98 academic years.

In 1998, Schilcher underwent a "pre-tenure review," also referred to as a "third-year review." During this process, she was evaluated not only to determine whether she should be reappointed for another academic year, but also whether she was making adequate progress toward tenure. The History Department, after noting room for improvement in her teaching and her collegiality, recommended her reappointment. The Personnel Committee of the College of Arts and Sciences,

---

[1] The Honorable Jimm Larry Hendren, Chief Judge, United States District Court for the Western District of Arkansas.

however, recommended that she not be reappointed because her teaching and publications did not meet the standards for progress toward tenure. Dean Madison considered these recommendations and decided not to reappoint Schilcher. She appealed to Dean Madison and Vice Chancellor Pederson. After considering her appeal, they affirmed the decision not to reappoint her.

Schilcher then sued in district court, alleging many claims under federal and state law. The defendants[2] moved for summary judgment. The district court granted their motion almost in its entirety, dismissing all but one of Schilcher's claims for damages against the defendants in their individual capacities. The single claim which survived summary judgment is the allegation that Madison and Pederson violated Schilcher's First Amendment rights: that, in deciding not to reappoint her, they were substantially motivated by her previous speech on matters of public concern.

On this claim, Madison and Pederson made four arguments why they were entitled to summary judgment, all of which the district court rejected. Madison and Pederson argued that Schilcher's speech did not address matters of public concern; that even if she had engaged in protected speech, her speech was not a substantial or motivating factor in their decision not to reappoint her; that Madison and Pederson would not have reappointed Schilcher, regardless of whether she had engaged in protected speech, because she had made inadequate progress toward tenure; and that they were entitled to qualified immunity because the summary judgment record showed no violation of her clearly established rights.

Pederson, Madison, and the Board of Trustees now appeal from the denial of qualified immunity.

---

[2] Additional defendants below–Mark Cory, Hoyt Purvis, Adnan Haydar, and Mounir Farah–are not parties to the instant appeal.

## II.

An immediate appeal from the denial of qualified immunity, such as this one, is quite limited in scope. The only question that is immediately appealable is whether, taking as true the facts in the summary judgment record that favor the plaintiff, it has been shown that the defendants violated clearly established law. See Johnson v. Jones, 515 U.S. 304, 311 (1995). Beyond this narrow issue, we may exercise jurisdiction only over issues that are "inextricably intertwined," meaning issues that would necessarily be resolved when we resolve the question of qualified immunity. See Lockridge v. Bd. of Trs. of the Univ. of Ark., 315 F.3d 1005, 1012-13 (8th Cir. 2003) (en banc).

## III.

Like the district court, we take as true the facts in the summary judgment record favorable to Schilcher and determine whether those facts show a violation of clearly established law by Madison and Pederson. See Johnson, 515 U.S. at 319. It is clearly established that a public employer may not discharge an employee for engaging in protected speech. See Sexton v. Martin, 210 F.3d 905, 910 (8th Cir. 2000). If the facts most favorable to Schilcher do not show that she spoke on matters of public concern, or do not show that Madison and Pederson were aware of her speech when they did not reappoint her, then they would be entitled to qualified immunity. This is the touchstone of our analysis.

It is clearly established that speech about the misuse or waste of public funds is generally of public concern. See Domina v. Van Pelt, 235 F.3d 1091, 1098 (8th Cir. 2000). In the context of a state university, we have previously held that a professor's allegations of misused funds and poor administration constituted speech on matters of public concern. See Hamer v. Brown, 831 F.2d 1398, 1400-02 (8th Cir. 1987).

However, it is not enough to say that a particular topic or subject is, at some level of abstraction, a matter of public concern. We must analyze the content, form, and context of the speech to determine whether the speaker was acting primarily as a concerned citizen or as an employee. If the speech was mostly intended to further the employee's private interests rather than to raise issues of public concern, her speech is not protected, even if the public might have an interest in the topic of her speech. See Sparr v. Ward, 306 F.3d 589, 594-95 (8th Cir. 2002).

Although this is a question of law, it is, to say the least, a fact-intensive inquiry. Our inquiry in this case was not particularly well-aided by the parties' submissions on appeal. The briefs dwell on issues that are beyond the scope of this appeal when they should focus on guiding us through the long and confusing summary judgment record that fills several thick volumes of appendices. Nonetheless, we have done our best to make sense of this case, and we have gleaned from the record the following instances of speech by Schilcher that Madison and Pederson were aware of when they did not reappoint her.

## A.

The summary judgment record shows that Schilcher began telling the Chair of the History Department, Daniel Sutherland, as early as 1996 that she believed she was being discriminated against by the administrators of the Middle East Studies Program. She complained to him that the administrators, Director Adnan Haydar and Associate Director Mounir Farah, both men of Arab descent, treated her poorly because she was a woman and a non-Arab. She further complained that female and non-Arab students in the program were also being discriminated against, and that Haydar and Farah's poor administration of the program was wasting its substantial endowment.

According to Schilcher's deposition testimony, Sutherland told her that Madison was aware of her concerns. (Appellee's App. at 949-50.) Sutherland

confirmed this in his deposition testimony. He recalled that on at least one occasion, most likely during the spring of 1996, he alerted Madison to Schilcher's concerns about the operation of the Middle East Studies Program. Specifically, Sutherland recalled relaying Schilcher's perception that she was having trouble getting her projects approved and her ideas addressed because Haydar and Farah were Arab men who expected women to be subservient. (Id. at 1055, 1063-68.)

In June 1996, Schilcher (who was then still in her first year at the university) and the three other professors who constituted the "core faculty" of the Middle East Studies Program wrote a letter to Dean Madison. They asked to be put in charge of administering the program, suggesting that this would an improvement over Haydar and Farah's leadership. (Appellants' App. at 639.)

The summary judgment record further shows that Madison knew Schilcher had aired her concerns to students. In October 1997, an undergraduate senior who was enrolled in one of Schilcher's classes wrote to Madison and Sutherland. The student complained that Schilcher spent class time criticizing the leadership and direction of the program. "[Schilcher] has repeatedly implied that Dr. Farah 'has it in for her' because she is a woman, and that the large Middle Eastern studies endowment is being misused, even going so far as to make an outright accusation of corruption within that program." The student cited a day in which Schilcher "spent all but fifteen minutes of a one hour and twenty minute class chatting with the graduate students about departmental politics and her difficulties with the Middle Eastern Studies program." (Appellee's App. at 134.)

Sutherland and Mark Cory, the Associate Dean for International Programs, met with the student and filed a report with Madison. Sutherland noted that he "had heard most of the complaints before, voiced by Dr. Schilcher and others, but [had] never known Dr. Schilcher or any other faculty member to state their criticism in the presence of students." The student recalled two areas of criticism by Schilcher.

"First, she complained that people with little or no experience in Middle East studies have been given an inordinate voice in organizing and establishing the direction of [the program and] attributed her own inability to influence the program to a prejudice against women . . . and the influence of Dr. Monuir Farah." "The second area of complaint involved the expenditure of [program] funds . . . to send non-[program] faculty on trips to the Middle East [and for] faculty to make private purchases while in the Middle East." Sutherland had discussed the situation with Madison before interviewing the student, and he closed his report by asking Madison to direct him how to proceed. (Id. at 59-60.) In their deposition testimony, Madison (id. at 828) and Pederson (id. at 934) each specifically recalled the student complaint.

When the History Department conducted its third-year review of Schilcher in May 1998, Sutherland sent Madison a letter summarizing the findings of the professors who had visited Schilcher's class to evaluate her teaching. One evaluator had "expressed concern over what he took to be [Schilcher's] criticism of the . . . program (specifically, its tendency to ignore the region of the old Ottoman Empire)." Sutherland noted that "[o]ther people, both faculty and students, have mentioned Dr. Schilcher's tendency to criticize perceived weaknesses in [the program], and it is clearly an area that she must treat with more sensitivity." (Id. at 25-26.)

As part of Schilcher's third-year review, Dr. Haydar (in his capacity as the Director of the Middle East Studies Program) prepared a review of Schilcher in February 1998. In it, he noted that she was "opposed to the Program's administration" and "undermined the existing administrative leadership." He said, "Three times she charged out of meetings when her activities or proposals were questioned." Haydar commented on occasions when she had criticized the program's administration and policies. (Id. at 73-74.) Haydar's review was included in the materials that were sent to Madison and Pederson during Schilcher's appeal.

In her appeal to Madison and Pederson, Schilcher alleged at length various ethical and procedural violations in the Middle East Studies Program's administration. (Id. at 28-52.) She noted Madison's awareness of the dissension among the program's faculty by recounting a time when he attended a program meeting and blamed the faculty members who were critical of the program administration for "destroying" the program. (Id. at 29.) Schilcher noted her ongoing attempts to reform the program's governance structure, beginning with the June 1996 letter that the four core faculty members sent to Madison. (Id. at 39.)

B.

Viewing the summary judgment record in the light most favorable to Schilcher, as we must, we agree with the district court's conclusion that she spoke on matters of public concern and that Madison and Pederson were aware of her protected speech when they did not reappoint her. While the purpose of Schilcher's speech was undoubtedly mixed–intended to raise issues of public concern while also furthering her own private interests–the content, form, and context of her speech leads us to conclude that she was not speaking exclusively or predominantly in pursuit of her own interests. For example, in the most recent case in which we held that an employee at a public college "was speaking solely as an employee–and not as a concerned taxpayer," Koehn v. Indian Hills Cmty. Coll., 371 F.3d 394, 396 (8th Cir. 2004), we noted that while the employee's topic of discussion with his coworkers–the college's employee salary list–could sometimes be of public concern, the employee "did not question the salaries as a misuse of public funds, call for reforms in the method of determining salaries, or otherwise voice any criticisms or concerns about the published salaries," id. In contrast, Schilcher did exactly what Koehn failed to do: she *did* criticize the administration of the Middle East Studies Program as wasting the program's endowment, she *did* call for and propose reforms, and she *did* otherwise voice her criticisms and concerns on multiple occasions.

The appellants rightly direct our attention to <u>de Llano v. Berglund</u>, 282 F.3d 1031 (8th Cir.), <u>cert. denied</u>, 537 U.S. 973 (2002). That case involved a state university professor who was terminated and sued, alleging that his speech on matters of public concern led to his termination. He lost on summary judgment in the district court, and we affirmed on appeal. We reviewed the letters he had sent to newspapers and to the university president, and we concluded that they were dominated by a "pattern of publicly complaining about private disputes that were unique to him and not a matter of public concern," with only "occasional . . . comments that are properly characterized as issues of public concern." <u>Id.</u> at 1037.

Given this characterization of the record in <u>de Llano</u>, we are convinced that the instant case is a closer one. The content of Schilcher's speech (including concerns about corruption and misuse of public funds, curricular deficiencies, and discrimination against persons other than herself), the form of her speech (being directed up the chain of command to the program administrators, the chair of her department, and the dean of her college), and the context of her speech (expressing views shared by other faculty and beginning long before the university took any adverse employment action against her) give rise to an inference that she was speaking as a concerned citizen. At minimum, the inference that she was speaking as a concerned citizen is at least as strong as the inference that she was speaking as an employee furthering her own interests.

We are mindful that we are at the summary judgment stage, and we think that this case is an illustration of the adage that summary judgment should be used in employment cases only when all of the evidence "point[s] one way" and "no reasonable inferences" can be drawn in favor of the nonmoving party. <u>Hardin v. Hussman Corp.</u>, 45 F.3d 262, 264 (8th Cir. 1995).

IV.

We conclude that the two remaining arguments that Madison and Pederson made below and reassert on appeal–that even if Schilcher had engaged in protected speech, her speech was not a substantial factor in their decision not to reappoint her; and that they would not have reappointed her, regardless of whether she had engaged in protected speech, because she had made inadequate progress toward tenure–are not reviewable in this appeal from the denial of qualified immunity because the district court found a genuine issue of material fact as to whether Schilcher's speech influenced Pederson and Madison's decision not to reappoint her. See Johnson, 515 U.S. at 319-20; Kincade v. City of Blue Springs, 64 F.3d 389, 395 (8th Cir. 1995), cert. denied, 517 U.S. 1166 (1996). Likewise, we conclude that the remaining arguments the appellants present in their brief are beyond the scope of this appeal because they are not inextricably intertwined with the question of qualified immunity. See Lockridge, 315 F.3d at 1013; Kincade, 64 F.3d at 395.

Accordingly, we affirm the district court's denial of qualified immunity, and we dismiss on our own motion the remainder of the appeal for lack of jurisdiction. We deny as moot both Schilcher's pending motion to dismiss the appeal and the appellants' pending motion to strike Schilcher's motion to dismiss.

_____