# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2485

_____

| | | |
|---|---|---|
| Mindy Kahle, | * | |
| | * | |
| Plaintiff/Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Jermaine Leonard, individually and | * | |
| in his official capacity, | * | |
| | * | |
| Defendant; | * | |
| | * | Appeal from the United States |
| Deputy Tim Malone, individually | * | District Court for the |
| and in his official capacity, | * | District of South Dakota. |
| | * | |
| Defendant/Appellant; | * | |
| | * | |
| Sheriff Don Holloway, individually | * | |
| and in his official capacity; | * | |
| Pennington County Sheriff's Office; | * | |
| Pennington County Jail; Scott Schuft, | * | |
| individually and in his official capacity, | * | |
| | * | |
| Defendants. | * | |

_____

Submitted: November 17, 2006
Filed: February 12, 2007

_____

Before LOKEN, Chief Judge, MELLOY, Circuit Judge, and SCHILTZ,[1] District
     Judge.

————————

SCHILTZ, District Judge.

Deputy Tim Malone appeals from the denial of his motion for summary
judgment in Mindy Kahle's 42 U.S.C. § 1983 action. Kahle alleges that Malone
violated her constitutional rights while she was detained at the Pennington County Jail
in Rapid City, South Dakota. Specifically, Kahle alleges that Malone, a supervisor
at the Jail, was deliberately indifferent to a substantial risk that she would be sexually
assaulted by correctional officer Jermaine Leonard. Malone moved for summary
judgment on the ground of qualified immunity. The district court[2] denied Malone's
motion, holding that, if a jury accepts Kahle's version of the events, Malone will not
be protected by qualified immunity. We affirm.

## I. Background[3]

Leonard applied for a correctional officer position with the Jail in August 2002.
After conducting a background check, the Jail hired Leonard, and he began an eight-
week training program in November 2002. He was scheduled for two weeks of
classroom study and six weeks of supervised, on-the-job training.

---

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District
of Minnesota, sitting by designation.

[2]The Honorable Karen E. Schreier, Chief Judge, United States District Court
for the District of South Dakota.

[3]The parties dispute many of the facts. We must assume, for purposes of this
appeal, that Kahle's version of the facts is true. *See Twymon v. Wells Fargo & Co.*,
462 F.3d 925, 928 n.2 (8th Cir. 2006).

The events giving rise to Kahle's lawsuit occurred on the evening of December 14, 2002, while Kahle was being held at the Jail, and while Leonard was still completing his on-the-job training. Malone, a senior correctional officer, was asked to supervise Leonard that evening. As the supervisor, Malone was supposed to observe Leonard closely and ensure that Leonard did not act improperly.

At 10:00 p.m. each night, the cells in the Jail were locked down and the lights turned off. Jail policy recognized that the entry of a correctional officer into a cell after lockdown was an unusual and (literally) noteworthy event. The Jail required that, if a cell door was opened after lockdown for any reason, that event had to be noted in the shift log. As the supervisor on duty on December 14, Malone was responsible for ensuring the accuracy of the shift log.

Kahle's cell was located on the upper level of cell block 5. Between 10:00 and 11:00 p.m. on December 14, Leonard entered Kahle's cell three times. The first time Leonard kissed Kahle and tried to pull down her pants. The second time Leonard kissed Kahle, pulled down her pants, and performed oral sex on her. When Kahle resisted, Leonard slammed her against the wall, which inadvertently set off his CB radio. As he was leaving the cell after assaulting Kahle, Leonard asked if he could take some drawings that Kahle possessed, and Kahle consented. The third time Leonard returned the drawings, then kissed Kahle and rubbed his genitals against hers. The first visit lasted approximately three minutes, and the second at least five minutes. It is unclear how long the third visit lasted.

During the hour that Leonard repeatedly entered Kahle's cell and sexually assaulted her, Malone was sitting at the work station in cell block 5. Leonard told Malone each time that he went up to Kahle's cell. After Leonard's second visit to Kahle's cell, Leonard returned to the work station, showed Kahle's drawings to Malone, and told Malone that he was going to trace one of the drawings (apparently a heart encircled by a rose) and then return the drawings to Kahle. Malone voiced no

concern, despite the fact that Leonard was an untested trainee and Malone was his supervisor.

The fact that Leonard told Malone three times that he was going up to Kahle's cell — and the fact that Malone knew that Leonard first received drawings from Kahle and then returned them — does not necessarily mean that Malone knew that Leonard was entering Kahle's cell. Leonard and Kahle could have been talking and passing the drawings back and forth without opening her cell door. But the work station at which Malone was sitting had a panel of lights, with each light indicating whether a cell door was locked or unlocked. Each of the three times that Leonard unlocked the door to enter Kahle's cell, a light on the panel would have switched from green (locked) to red (unlocked) and stayed red until the door was locked again. For example, during Leonard's second visit to Kahle's cell, a red light would have been illuminated for more than five minutes. Yet Malone claims that at no time between 10:00 and 11:00 p.m. did he notice a red light on a panel of green lights just a couple of feet in front of his face.

Malone also claims that, from where he was seated, it was impossible for him to observe Kahle's cell. Kahle testified, however, that she saw Malone look up during Leonard's second visit to her cell — the visit during which Leonard's CB radio was accidentally set off. Leonard also testified that, although he does not know what Malone saw, he would be surprised if Malone did not see him kissing Kahle. And Pennington County Sheriff Don Holloway, who was originally a defendant in this case, testified that "Correctional Officer Malone is wrong. You can see into those cells [from the work station]." Appellee's App. 32.

As noted, Malone was required to keep a written record of each time an inmate's door was opened after lockdown. He did not record any of Leonard's three visits to Kahle's cell. Of course, Malone's explanation is that, although a trainee that he was supervising went to the cell of a female detainee three times during the first

hour of lockdown, Malone did not so much as glance up at her cell door — or glance down at the panel of lights — to ensure that the trainee did not enter her cell.

Malone moved for summary judgment in the district court, arguing that he is shielded from liability for his actions by qualified immunity. The district court rejected Malone's argument, holding that there is a question of fact concerning whether Malone violated Kahle's clearly-established constitutional rights by demonstrating deliberate indifference to a substantial risk that she would be sexually assaulted by Leonard. Malone filed this appeal.

## II. Analysis

### A. *Jurisdiction*

Ordinarily, appellate courts lack jurisdiction to review a denial of summary judgment. *See Johnson v. Jones*, 515 U.S. 304, 309 (1995). There is an exception to this rule when a district court denies a summary-judgment motion that is based on the defense of qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Qualified immunity protects state actors from civil liability when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005). When a district court denies a defendant's motion for summary judgment based on qualified immunity, the defendant may immediately appeal the "purely legal" issue of "whether the facts alleged . . . support a claim of violation of clearly established law." *Mitchell*, 472 U.S. at 528 n.9. In this type of interlocutory appeal, jurisdiction does not extend to issues of "'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial." *Johnson*, 515 U.S. at 313. Put another way, "if the issues relate to whether the actor actually committed the act of which he is accused . . . we have no jurisdiction

to review them in an interlocutory appeal." *Miller v. Schoenen*, 75 F.3d 1305, 1309 (8th Cir. 1996).

Kahle argues that this Court lacks jurisdiction over Malone's appeal because the district court found that there were factual issues concerning whether Malone acted with deliberate indifference. But "[d]enial of summary judgment often includes a determination that there are controverted issues of material fact, . . . and *Johnson* surely does not mean that every such denial of summary judgment is nonappealable." *Behrens v. Pelletier*, 516 U.S. 299, 312-13 (1996). Although there is no interlocutory appellate jurisdiction to decide whether a particular defendant actually engaged in the conduct alleged,

> [b]y way of example, whether an inmate has alleged sufficient facts to allow a jury to conclude that the inmate faces a risk of assault from other inmates, prison officials know of the risk, and the reasonableness of their actions in light of a known risk are all reviewable in an appeal of a denial of qualified immunity at the summary-judgment stage.

*Miller*, 75 F.3d at 1308.

On this appeal from the order denying Malone's motion for summary judgment, we do not have jurisdiction to decide, for example, whether there is sufficient evidence for a jury to find that Kahle did not consent to the sexual contact with Leonard. But we do have jurisdiction to decide whether, assuming that all of the facts alleged by Kahle are true, Malone is entitled to qualified immunity as a matter of law. *See Miller*, 75 F.3d at 1309 ("The question of what was known to a person who might be shielded by qualified immunity is reviewable, to determine if the known facts would inform a reasonable actor that his actions violate an established legal standard."); *see also Henderson v. Munn*, 439 F.3d 497, 501 (8th Cir. 2006) (citing *Miller*). We now turn to that question.

## B. The Merits

We review de novo a district court's denial of a motion for summary judgment on grounds of qualified immunity. *See Pagels v. Morrison*, 335 F.3d 736, 739 (8th Cir. 2003). Determining whether a state actor is entitled to qualified immunity involves two questions: First, did the official deprive the plaintiff of a constitutional or statutory right? If not, he does not need qualified immunity, as he is not liable under § 1983. If so, we ask the second question: Was that right so clearly established at the time that a reasonable official would have understood that his conduct was unlawful under the circumstances? *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the right was not clearly established, then the officer is protected by qualified immunity.

## 1. Liability under § 1983

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). These conditions include measures taken to guarantee the safety of inmates. *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). Because Kahle was a pretrial detainee at the time of the alleged violation, her § 1983 claim is not analyzed under the Eighth Amendment, but instead under the Fourteenth Amendment's Due Process Clause. *See Owens v. Scott County Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003). This makes little difference as a practical matter, though: Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment. *See Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006).

A prison official may be held liable to a detainee if he directly participated in the violation of her constitutional rights or if his failure to train or supervise the

offending actor caused the violation. *See Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806-07 (8th Cir. 1994). A failure-to-supervise claim may be maintained only if the official "demonstrated deliberate indifference or tacit authorization of the offensive acts." *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998) (citation and quotations omitted). The deliberate-indifference standard is a subjective one: "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. The official need not believe that serious harm will actually befall an inmate; it is sufficient that the official knows of a substantial risk that the inmate will suffer serious harm. *Id.* at 842.

Malone does not dispute that sexual assault is a serious harm. *See id.* at 833 ("gratuitously allowing the beating or rape of one prisoner by another serves no 'legitimate penological objectiv[e]'") (quoting *Hudson v. Palmer*, 468 U.S. 517, 548 (1984)). Thus, if there was a substantial risk that Kahle would suffer that harm, and if Malone was deliberately indifferent to that risk, then Malone can be held liable under § 1983 for violating Kahle's rights under the Fourteenth Amendment (unless Malone enjoys qualified immunity).

Malone argues that he did not violate Kahle's rights because he was not subjectively aware that she was, in fact, being sexually assaulted. Malone misunderstands the deliberate-indifference standard. To be deliberately indifferent, Malone did not have to know that Kahle was being sexually assaulted, but only that she was at substantial *risk* of being sexually assaulted. The Supreme Court has been clear on this point:

> [A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.

*Id.* at 842.  This Court has been equally clear:

> [I]n order to have a viable deliberate indifference claim, a plaintiff is *not* required to allege and prove that the defendant . . . specifically knew about or anticipated the precise source of the harm.

*Krein*, 309 F.3d at 491.

In the face of this authority to the contrary, Malone cites a recent decision of this court — *Spann v. Roper*, 453 F.3d 1007 (8th Cir. 2006) (per curiam) — for the proposition that "if the supervisor is not the perpetrator, the law requires that the supervisor know about the perpetrator's misconduct and in some way acquiesce in that conduct." Appellant's Br. 21.  But *Spann* does not say that.  Indeed, the only language in *Spann* that comes close to saying that is in a parenthetical that describes another case on which Malone relies, *Ottman v. City of Independence*, 341 F.3d 751 (8th Cir. 2003).  In *Ottman*, a brief paragraph that summarizes the law regarding supervisory liability ends by quoting a prior Eighth Circuit decision's quotation of a sentence from a Seventh Circuit opinion:

> "The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see." *Ripson v. Alles*, 21 F.3d 805, 809 (8th Cir.1994) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988)).

*Id.* at 761.  Malone relies primarily on this sentence.

A close reading of *Spann*, *Ottman*, *Ripson*, and *Jones* reveals that none supports Malone's assertion that a supervisor cannot be held liable under § 1983 unless he was subjectively aware of the actual harm that the plaintiff experienced.  Even the sentence from *Jones* that is quoted in *Ripson* and again in *Ottman* suggests otherwise. The "conduct" to which that sentence refers must be the conduct that gives rise to the

-9-

*risk* of a constitutional violation, because a supervisor cannot both "know" of a constitutional violation and "turn a blind eye for fear" that he "might see" a constitutional violation. The sentence becomes even clearer when read in conjunction with the sentence that immediately follows it in the *Jones* opinion: "They must in other words act *either* knowingly *or* with deliberate, reckless indifference." 856 F.2d at 992-93 (emphasis added). Thus, *Jones* itself makes clear that a supervisor can act with "deliberate, reckless indifference" even when he does not act "knowingly." The quotation of *Jones* in rather casual dicta in *Ottman* and *Ripson* — and the terse summary of *Ottman* in a parenthetical in *Spann* — were not meant to call into question the consistent holdings of the Supreme Court and this Court that a supervisor can be found liable under § 1983 for deliberate indifference if he is aware of "a substantial risk of serious harm," even if he is not aware that the harm has, in fact, occurred. *Farmer*, 511 U.S. at 842.

We agree with the district court that, if the jury accepted Kahle's version of the facts, the jury could find that Malone was aware of a substantial risk of serious harm to Kahle and exhibited deliberate indifference to that risk. Malone conceded, at his deposition, that no one is supposed to go into an inmate's cell after lockdown. Yet he knew that Leonard, a trainee with barely a month's experience working at the Jail (and therefore not someone whom Malone would have any reason to trust), went to a female detainee's cell three times after lockdown within the space of an hour. On at least one of those occasions, Leonard stayed in her cell for at least five minutes.

Malone denies that he noticed the lights on the indicator panel changing color. It is difficult to know whether his cause will be hurt more if the jury believes him or disbelieves him. If the jury disbelieves him, the jury may conclude that Malone has lied under oath, that Malone saw the red light indicating that Leonard had entered Kahle's cell three times for no legitimate reason and stayed once for over five minutes, and that Malone did absolutely nothing about it. The jury could find deliberate indifference under those circumstances. If the jury does not believe

-10-

Malone, the jury may conclude that, despite being told three times in the space of an hour that a trainee was going to the cell of a female detainee, Malone cared so little about the safety of that detainee that he did not even glance at the panel of lights in front of his face. The jury could find deliberate indifference under those circumstances as well.

A similar point can be made about Malone's testimony that he could not see Kahle's cell. If the jury believes him, then the jury may well conclude that Malone's failure to glance at the panel of lights was even more egregious, as it was the only means he had for ensuring that Leonard was not entering Kahle's cell. If the jury disbelieves him — and credits instead Sheriff Holloway's testimony that the cell door was visible and Kahle's testimony that Malone looked up and saw Leonard standing near the open door of her cell — then the jury may conclude that Malone has lied under oath and covered up Leonard's conduct by failing to record it in the shift log. Again, these conclusions may lead the jury to find deliberate indifference.

It is true, as Malone argues, that he cannot be charged with inferences that he did not actually draw. But the Supreme Court has explained that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. On this record, a reasonable jury could conclude that Malone was aware of a substantial risk of serious harm to Kahle and that he exhibited deliberate indifference to that risk.

## 2. Qualified Immunity

The second question in the qualified-immunity analysis requires us to consider whether the right that Malone allegedly violated was clearly established at the time of the violation. It is not enough that the right be established in an abstract sense. *See Saucier*, 533 U.S. at 201. For example, it is not enough that the right of detainees to be free from cruel and unusual punishment be clearly established as of December 14,

-11-

2002. At a high enough level of abstraction, every constitutional right is clearly established. Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, Kahle must demonstrate that, on December 14, 2002, a reasonable prison official in Malone's position would have known that exhibiting deliberate indifference to a substantial risk that Leonard would sexually assault Kahle was unlawful. *See Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002) ("Qualified immunity is an affirmative defense for which the defendant carries the burden of proof. The plaintiff, however, must demonstrate that the law is clearly established.").

We have no difficulty in concluding that Kahle has met her burden:

First, it has long been established in this Circuit and elsewhere that "[a] prison official may be held liable under the Eighth Amendment if he or she knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997); *see also Farmer*, 511 U.S. at 847 ("[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."); *Massick v. N. Cent. Corr. Facility*, 136 F.3d 580, 581 (8th Cir. 1998) ("The legal standard requires a plaintiff to show that defendants knew that he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. See *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Certainly the right, thus abstractly stated, was clearly established." (parallel citations omitted)).

Second, no reasonable prison official in Malone's position could have concluded on December 14, 2002, that a detainee who was sexually assaulted by a

prison guard did not suffer a "serious harm." The Ninth Circuit put the point well in 2000:

> In the simplest and most absolute of terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established prior to the time of this alleged assault, and no reasonable prison guard could possibly have believed otherwise.

*Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000) (upholding denial of prison guard's motion for summary judgment on the basis of qualified immunity). Courts have held on multiple occasions — both before and after December 14, 2002 — that the sexual assault of an inmate by a guard violates the inmate's constitutional rights. *See Williams v. Prudden*, 67 Fed. Appx. 976, 977 (8th Cir. 2003) (per curiam) (holding that an inmate "sufficiently state[d] an Eighth Amendment claim by alleging that [the guard] forcibly ground his pelvis against her, grabbed her breast, verbally demanded sexual favors, made physical sexual advances, and attempted to force himself upon her"); *Berryhill v. Schriro*, 137 F.3d 1073, 1076 (8th Cir. 1998) ("Certainly, sexual or other assaults [by civilian prison employees] are not a legitimate part of a prisoner's punishment, and the substantial physical and emotional harm suffered by a victim of such abuse are compensable injuries."); *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998) ("Clearly [inmates'] deprivations resulting from the sexual assaults [by a prison guard] are sufficiently serious to constitute a violation under the Eighth Amendment."); *Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993) ("We agree with Ms. Hovater that an inmate has a constitutional right to be secure in her bodily integrity and free from [sexual] attack by prison guards.").

Thus, as of December 14, 2002, it was clearly established that a prison official could be held liable under § 1983 for exhibiting deliberate indifference to a substantial risk that a detainee would be sexually assaulted by a guard. Several judicial opinions had said so directly. *See, e.g.*, *Daskalea v. Dist. of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000) (upholding jury verdict against District for supervisors' deliberate

indifference to sexual abuse of female prisoner by guards); *Barney*, 143 F.3d at 1310 (acknowledging that prison officials could be liable for deliberate indifference to the risk of guard-on-inmate sexual assault, but finding no liability under the facts of the case); *Hovater*, 1 F.3d at 1066 (applying deliberate-indifference standard to failure-to-supervise claim in case involving rape of inmate by guard). And these opinions are reinforced by other opinions holding that a prison official can be held liable for deliberate indifference to a substantial risk that one *inmate* will sexually assault another. *See, e.g.*, *Vosburg v. Solem*, 845 F.2d 763, 765-67 (8th Cir. 1988) (upholding a jury's verdict finding prison officials liable for deliberate indifference to rape of inmate); *Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005) ("There can be no debate that this right [to be free from deliberate indifference to rape and assault] was clearly established"); *Calderon-Ortiz v. Laboy-Alvarado*, 300 F.3d 60, 63-64, 66 (1st Cir. 2002) (holding that inmate's allegation of rape was sufficient to state a due process claim).

Without question, then, Kahle's constitutional right to be protected from being sexually assaulted by a guard was clearly established on December 14, 2002, as was the fact that a supervisor who was deliberately indifferent to a substantial risk of such an assault could be held liable under § 1983. "[I]t would be clear to a reasonable officer [in Malone's position] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

Because a reasonable juror who accepted Kahle's version of the events could conclude that Malone violated Kahle's clearly-established constitutional rights by demonstrating deliberate indifference to a substantial risk that she would be seriously harmed by Leonard, the district court's denial of Malone's summary-judgment motion is AFFIRMED.

_____