# United States Court of Appeals

### For the Eighth Circuit

_____

No. 17-1260

_____

Ronda L. Marsh, and all others similarly situated

*Plaintiff - Appellant*

v.

Phelps County; Gene Samuelson, Individually and in his official capacity as
Sheriff; Penny Gregg, Individually and in her official capacity as Phelps County
Correctional Lieutenant; Louis P. Campana, in his official capacity

*Defendants - Appellees*

Louis P. Campana, Individually

*Defendant*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: May 16, 2018
Filed: August 15, 2018

_____

Before SMITH, Chief Judge, BEAM and COLLOTON, Circuit Judges.

_____

BEAM, Circuit Judge.

Former Phelps County inmate Ronda Marsh appeals from the district court's[1] grant of summary judgment in favor of Phelps County, and Sheriff Gene Samuelson, Corrections Lieutenant Penny Gregg, and Louis P. Campana in their official capacities[2] (collectively, "the County"), as well as the court's dismissal of the claims against Samuelson and Gregg individually, in this 42 U.S.C. § 1983 action. We affirm.

## I.    BACKGROUND

Marsh alleges she was sexually assaulted by former corrections officer Louis Campana while she was incarcerated at the Phelps County Jail for five days in June 2012. Marsh sued Phelps County and the three jail employees in their individual and official capacities, claiming Campana's actions shocked the conscience; that the County was deliberately indifferent in violation of her Eighth Amendment rights by failing to protect her from the known risk of harm presented by Campana; and that she and other similarly situated females were denied Equal Protection in violation of the Fourteenth Amendment.

---

[1]The Honorable Cheryl R. Zwart, United States Magistrate Judge for the District of Nebraska, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

[2]Because at all times the claims against Phelps County encompassed all official capacity claims against Samuelson, Gregg, and Campana, see Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (official-capacity suits are treated as suits against official entity), the district court's resolution of the matter against Phelps County effectively resolved all claims against each named individual in their official capacity, including Louis P. Campana, Jr.

-2-

As this is an appeal from a grant of summary judgment, the following facts are stated in the light most favorable to Marsh.[3] Skalsky v. Indep. Sch. Dist. No. 743, 772 F.3d 1126, 1128 (8th Cir. 2014). Sheriff Samuelson was elected Sheriff in 2011 and Lieutenant Gregg began her employment with the Phelps County Sheriff's Office in 1999, serving as jail administrator since 2001. The Phelps County Jail hired Campana on April 21, 2010, after conducting a background check that disclosed only a speeding citation. Campana's application revealed that he had previously worked as a school janitor, as an assistant manager at Sun Theater, and as a host home provider for disabled persons. This employment was verified by Lieutenant Gregg. Nothing on the application or the background check was cause for concern and Gregg recalls that all pre-hire reference checks were positive. Lieutenant Gregg verified Campana's employment at Sun Theater with one of the references who did not voice any concerns about Campana's job performance there. However, there was a corrections officer who had formerly worked with Campana who was also listed as a reference on Campana's application who later recalled (when interviewed following Campana's July 2012, suspension) that he notified Gregg at the time of Campana's hiring that Campana might "possibly [have] problems working around females."

Campana began work at the jail and successfully completed the jail's training program, which began upon hire and continued throughout his employment, wherein he completed the requisite hours of policy and procedure training and passed the many policy exams. This training included instruction on, among many other things,

_____

[3]We note that "in the light most favorable" to Marsh does not necessarily mean the facts "as stated by" Marsh in her brief on appeal, as there are multiple facts stated in the brief that are not supported by record evidence or are contradicted by the record evidence. As one example, Marsh insists Phelps County did not perform a criminal background check on Campana and thus the district court erred in stating that it had. In fact, the County did perform a criminal background check as is evidenced by proof of the same in the record. Thus, we state the facts supported by the record in the light most favorable to Marsh.

appropriate staff-inmate communications, ethics, facility policies and procedures, and key control. Campana also reviewed and agreed to abide by Phelps County's personnel policies and code of ethics.

Phelps County conducted regular performance evaluations of Campana approximately every six months. He had received four evaluations prior to his suspension in 2012. Very generally, all four rated Campana as primarily "satisfactory" in the various components. There were concerns noted on these evaluations, including Campana's tendency to be too chatty with inmates, low marks for "control post" and "professionalism," that he needed to watch what he said over the radio because he had cursed over the radio, and the need to limit time at female cells. On one evaluation under a portion of the evaluation regarding "judgment," Campana's immediate supervisor wrote "[d]oing ok here. Does need to use better judgment when speaking to or around inmates. Limit time at female cell. Can open yourself up for a law-suite [sic]." Campana was counseled, generally, about his too friendly nature with inmates. Campana was promoted to Corporal in May 2012, two years after he was hired.

On May 27, 2012, Officer Lacey Stone sent an email to Lieutenant Gregg concerning the actions of a female inmate, Tammy Knight, that Officer Stone had reviewed "doing some very inappropriate things" on camera while in her cell overnight. Officer Stone professed that she and another officer were reviewing video from previous evenings to figure out when someone got out of bed and discovered the footage of the inappropriate incident. She wrote that "I'm not for sure who was in control that night, but maybe they should pay a little more attention or maybe they were?"

In response to Stone's email, Lieutenant Gregg reviewed the relevant surveillance video, as well as the video footage from the master control office from the same time period to see if any of the officers on duty might have seen the inmate's

behavior. Campana was the control officer on duty the night in question but Lieutenant Gregg did not observe anything about Campana's behavior from the footage to suggest that Campana was "fixated" on Knight on the video monitors during the relevant time period, nor did he appear to Gregg to be doing anything to indicate he was watching Knight. Lieutenant Gregg concluded that the officers on night shift duty, including Campana, were performing normal duties. Based on her experience and knowledge that it is very common for both female and male inmates to masturbate in their cells while incarcerated, Gregg determined the email and informal investigation did not supply any basis for corrective action against either the inmate or any night shift employee. She did not question the inmate or Campana about the incident. On May 29, 2012, Lieutenant Gregg emailed Sheriff Samuelson to notify him of the situation reported by Stone. Sheriff Samuelson personally reviewed the relevant video and agreed with Lieutenant Gregg's assessment that no disciplinary action was required.

In May or June of 2012, a co-worker of Campana's, Stephanie Johnson, reported to a shift supervisor, Christi Meyer, that she thought she had seen Campana put his arm around a female inmate. Shift supervisor Meyer investigated Johnson's concern by reviewing the applicable video footage, which clearly showed from a rear vantage that Campana never physically touched the inmate at the time in question. Meyer followed up with Johnson, and Johnson indicated that she might have been mistaken because her vantage point of Campana and the female inmate had been from the side, not the back, which was a more direct view. Meyer verbally informed Lieutenant Gregg about the complaint as well as how she resolved the matter.

At that same time, Officer Johnson verbally expressed concern to Lieutenant Gregg about Campana. Officer Johnson asked to rotate shifts because she no longer wanted to work with Campana because she was uncomfortable with the amount of time Campana spent interacting with female inmates. Johnson explained to Gregg that Campana would often request other correction officers to cover his position so

-5-

that he could go and speak with female inmates who had requested his assistance. Lieutenant Gregg told Officer Johnson to write a report detailing her request, as well as to formally report the incident she had reported to Meyer, but Johnson did not do so. At no time in this case did any correctional officer at the jail provide a written report to Lieutenant Gregg or Sheriff Samuelson regarding any suspicion that Campana was engaging in sexual misconduct with inmates.

Appellant Ronda Marsh was incarcerated at the Phelps County Jail from June 22, 2012, to June 27, 2012. During her incarceration, although she was aware of the processes available to her as an inmate, Marsh did not submit any complaints to jail staff or management regarding being subjected to or having observed any sexual misconduct, or that she was sexually assaulted by Campana. On July 11, 2012, Lieutenant Gregg learned of Campana engaging in inappropriate sexual conduct with inmates when Gregg returned a call to a former female inmate who informed Gregg that "the Corporal" (who Gregg discerned was Campana) had been acting inappropriately with female detainees at the jail. When asked for details, this inmate complained that Campana would inappropriately give candy to female inmates out of the camera view, make kissing gestures, had asked her for a hug, and pinched the nipple of a female inmate.

The same day Lieutenant Gregg learned of these allegations, Gregg advised Sheriff Samuelson and she began to investigate by attempting to contact another former inmate and by visiting with a current inmate who corroborated the allegations Lieutenant Gregg learned during the phone call. Sheriff Samuelson contacted Campana that same day as well and advised him that he would be on paid suspension pending an investigation of the matter. Thereafter, a review of video footage showed Campana in the areas of the jail where the females are housed but did not reveal any overtly sexual contact between Campana and a female inmate. However, Lieutenant Gregg and Sheriff Samuelson were concerned by one portion of the video they reviewed that appeared to depict some kind of physical contact between Campana and

a female inmate while he was seated at a table with a larger group of female inmates. Another video prompted concern from Gregg and Samuelson because it showed Campana spending an unusual amount of time inside a cell in a relaxed posture and conversing with several female inmates.

On July 13, two days after the former inmate made her initial complaint, Sheriff Samuelson contacted the Nebraska State Patrol (NSP) and requested it take over the investigation. Campana was formally placed on administrative leave without pay on July 17, 2012. Over the next two months, the NSP investigation revealed many violations by Campana, sexual in nature, and involving various inmates. Much of this activity occurred outside the view of the cameras between approximately March and July 2012.

The NSP's investigation included interviews with numerous jail staff members, as well as interviews with people who knew Campana from his previous jobs. It became apparent during the investigation that Campana was aware of where the cameras were located in the jail and that he deliberately stood out of view while in female inmates' cells or in other locations while around female inmates. After Campana was suspended, one inmate explained to a jail employee that Campana used an emergency set of keys to open cell doors without having to go through the control room. During that investigation, NSP officers learned from Campana's coworkers at the jail that they had heard Campana make various specific sexual or inappropriate comments in the workplace, that he spent inordinate time periods in the women's housing areas, and of one instance in which Campana "zoomed in" on female inmates using the surveillance camera in the master control office. None of these indiscretions and failings were written in a report or otherwise provided to Gregg or Samuelson, although a few employees indicated they did directly discuss with Campana behavior they witnessed from him that they perceived to be inappropriate. A former manager of Campana's from the Sun Theater also told NSP investigators that while he was employed at the theater she caught Campana looking at

pornography on multiple occasions at work and that she fired him for this behavior. Another former co-worker from the theater told NSP investigators that while she was employed at the theater, Campana would send her inappropriate texts, sexual in nature, and that she knew he was fired for viewing pornography. Investigators also spoke with additional female inmates at the Phelps County Jail who described sexual encounters between themselves and Campana as well as inappropriate sexual encounters they witnessed between Campana and other female inmates.

Campana resigned on September 28, 2012, at a time when Sheriff Samuelson had already decided to terminate him but was waiting for the drafted termination letter to be reviewed by the county attorney. Sheriff Samuelson accepted Campana's resignation on October 1, 2012. Campana's last physical work day in the jail was July 10, 2012. As a result of the NSP's investigation, Campana was charged with multiple counts of felony criminal sexual conduct for incidents involving five different female inmates between March and July 2012. Campana pleaded guilty to some of the charges and served a prison sentence beginning in June 2013. This civil matter commenced when Marsh sued Phelps County, Sheriff Samuelson, Lieutenant Gregg, and Officer Campana, individually and in their official capacities, for their alleged acts and failings that occurred during this time period. Following discovery, the district court granted summary judgment in favor of the County, and Samuelson and Gregg individually. The claim against Campana in his individual capacity remains pending in federal district court. Marsh appeals.

## II.   DISCUSSION

### A.   County Liability

This court reviews the grant of summary judgment de novo. Johnson v. Blaukat, 453 F.3d 1108, 1112 (8th Cir. 2006). As we have noted, "[a] suit against a public official in his official capacity is actually a suit against the entity for which the

official is an agent."  Elder-Keep v. Aksamit, 460 F.3d 979, 986 (8th Cir. 2006). Thus to sustain the actions against Samuelson, Gregg and Campana in their official capacities, Marsh must prove that the County "*itself* caused the constitutional violation at issue."[4]  Id. (quoting Kuha v. City of Minnetonka, 365 F.3d 590, 604 (8th Cir. 2003)).  In general, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents" on a respondeat superior theory of liability.  Monell v. New York Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). However,

> [l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.  Moreover, . . . local governments . . . may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

Id. at 690-91.  Under this rubric, we recognize claims challenging an unconstitutional policy or custom, or those based on a theory of inadequate training, which is an extension of the same.[5]  "[O]ur first inquiry in any case alleging municipal liability

---

[4]Marsh misses the mark when she argues, in relation to the official capacity claims, that Campana is not  absolved of misconduct in his official capacity because, at a minimum, he knew what he was doing and he was doing it at work.  That a municipal or governmental employee was working when alleged injuries and constitutional violation took place is not the relevant inquiry when imposing liability on the official entity.  See Collins v. City of Harker Heights, Tex., 503 U.S. 115, 121-22 (1992).

[5]"Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  City of Canton v. Harris, 489 U.S. 378, 389 (1989).  Stated

under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." Schaffer v. Beringer, 842 F.3d 585, 596 (8th Cir. 2016) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)). "To prove the existence of a policy, a plaintiff must point to 'an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters.'" Id. (quoting Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999)). "Further, the plaintiff must prove that the policy was the 'moving force' behind a constitutional violation." Id. (quoting Mettler, 165 F.3d at 1204)).

On appeal, Marsh claims that there is evidence here that there was a "policy" of allowing Campana to have unfettered access to the female inmates. She claims that despite there being concerns about his access to the female inmate population, nothing was done to prevent him from that contact. She points to the interviews with the multiple employees conducted after Campana's suspension who had concerns and knowledge of Campana's inappropriate behavior as proof that there was "a widespread practice of ignoring or not addressing the widespread knowledge that Campana engaged in sexually inappropriate behavior."

Even were we to determine that allowing one employee unfettered access to female inmates constitutes a policy or custom of the same sufficient to support a claim of liability against Phelps County under § 1983, there is no evidence of such

---

differently, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a [government entity]–a 'policy' as defined by our prior cases–can a city be liable for such a failure under § 1983." Id. And, to be sure, this standard of "deliberate indifference" discussed herein is not the same as that used in the Eighth Amendment context. Under § 1983 jurisprudence, the term is simply the threshold for holding a city responsible for the constitutional torts committed by its inadequately trained agents. Collins, 503 U.S. at 124; Canton, 489 U.S. at 388 n.8.

acquiescence on the part of the County in the record before us, despite Marsh's assertions to the contrary. That coworkers and inmates from Phelps County Jail later revealed to investigators they had concerns about Campana's interactions with female inmates, and some even talked to Campana about those concerns does not establish a County policy of allowing access. These recollections about access were not from officials with authority over such matters nor is there evidence that these concerns were conveyed to those with authority. On these facts, it is patently incorrect to claim that there was a "widespread" practice of ignoring the "widespread" knowledge that Campana engaged in sexually inappropriate behavior.

At the time the County hired Campana, a current corrections employee that had previously worked with Campana expressed that Campana might possibly have problems working around females. However, receipt and knowledge of that information upon hiring does not establish a policy of allowing Campana "unfettered access" to that inmate population, let alone that any such alleged access was the moving force behind the constitutional violation alleged here. In fact, the evidence establishes that the County counseled Campana regarding his too-friendly nature with the female inmates and his unprofessionalism in that same regard, which evidences the opposite of a policy condoning the conduct. At bottom, Marsh identifies no evidence that evinces a deliberate choice of a guiding principle or procedure made by Phelps County authorizing officers to engage in this behavior and no evidence suggests that one existed in the first instance. Schaffer, 842 F.3d at 596.

Additionally, as to the argument that the County failed to train its employees (and Campana, specifically) not to engage in sexually deviant behaviors, this court has held that there is no patently obvious need to train an officer not to sexually assault detainees in light of the regular law enforcement duties of officers and the fact that "[a]n objectively reasonable officer would know that it is impermissible" to engage in such behavior. Parrish v. Ball, 594 F.3d 993, 999 (8th Cir. 2010). While it might be wise and useful to plainly articulate such expectation in a training course,

-11-

not doing so does not result in causing an officer to actually sexually assault a female detainee. Id. Nothing in the record amounts to proof that any failure to train Campana caused Campana to sexually assault Marsh or other female inmates or that the County was deliberately indifferent to Marsh's rights as articulated in her complaint. Id. at 1000; Schaffer, 842 F.3d at 596.

Campana's behavior was regrettable, unlawful, unacceptable, and violated jail policies. In hindsight, just as with virtually all § 1983 plaintiffs who have had their constitutional rights violated by an official employee, Marsh is able to point to things the County could have done to prevent the unfortunate acts. Canton, 489 U.S. at 392. However, the County's failure to equate (a) Campana's unprofessional and too-friendly nature with female inmates, along with the fact that a co-worker expressed that Campana might possibly have problems working with females, with (b) a conclusion that he was engaging in unlawful and inappropriate sexual behavior with the inmate population, does not serve to establish a constitutional violation. Mendoza v. United States Immigration and Customs Enf't, 849 F.3d 408, 419-20 (8th Cir. 2017). The claims against the County were properly dismissed.

## B.     Individual Liability

Marsh's complaint also makes claims against Samuelson and Gregg in their individual capacities.[6] Specifically, Marsh claims Samuelson and Gregg were final

---

[6]Marsh also (briefly) makes state law arguments on appeal citing Nebraska Revised Statute § 47-115 and referencing, for the first time here, a "state created danger" theory. The district court held, and we agree, that Marsh did not allege a state law negligence claim in her complaint and thus it did not address the claim. The complaint likewise does not contain a state-created-danger theory that she now raises on appeal. We reject both claims, as this court does not ordinarily address claims not pled or those raised for the first time on appeal. See Ball v. City of Lincoln, 870 F.3d 722, 736 n.3 (8th Cir. 2017).

policymakers and supervisors over Campana and that they had a legal obligation to protect her and knew or should have known that their actions and omissions compromised the conditions of safety at the jail and created a substantial risk of serious injury to her. She claims they operated the jail with cameras that were improperly placed to protect the inmates, failed to provide adequate training and supervision to prevent sexual assault of inmates, and that they were deliberately indifferent to her personal safety.

Most, if not all, of Marsh's arguments on appeal rest on the premise that Samuelson and Gregg are liable as a result of their supervisory positions at the jail. As an example, she claims that "Samuelson acted as the jailer and thereby assumed liability for the misconduct of the other deputies." She further argues that even though sexual encounters were not reported, because the behavior occurred on a regular basis, the facility administrators knew of the inappropriate conduct. These theories are wholly inadequate to impose liability for supervisors under § 1983. S.M. v. Krigbaum, 808 F.3d 335, 340 (8th Cir. 2015). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). Accordingly, that harm occurred under Samuelson's and Gregg's watch is not the touchstone under § 1983. Any claims raised on a vicarious liability basis are not cognizable. "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Id. at 677.

Too, Marsh's claim that Samuelson and Gregg "knew or should have known" their actions or omissions created a substantial risk of injury to Marsh evinces a negligence standard not contemplated under § 1983. S.M., 808 F.3d at 342. "To establish personal liability of the supervisory defendants, [Marsh] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [her] constitutional rights." Mayorga v. Missouri, 442 F.3d 1128, 1132 (8th Cir. 2006).

As to Marsh's failure-to-train claim, "[a] supervisor's failure to train an inferior officer may subject the supervisor to liability in his individual capacity only 'where the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact.'" Schaffer, 842 F.3d at 596 (quoting Parrish, 594 F.3d at 1002).

Overarching these claims is qualified immunity. A supervising officer will not be individually liable for an otherwise unlawful act if he is entitled to qualified immunity. Qualified immunity protects government officials from liability for civil damages in their individual capacities if their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Government officials are entitled to qualified immunity unless (1) the plaintiff has asserted a violation of a constitutional right; (2) the alleged right is clearly established; and (3) there exists a genuine issue of material fact as to whether the official would have known that his alleged conduct would violate the plaintiff's clearly established right. Smithson v. Aldrich, 235 F.3d 1058, 1061 (8th Cir. 2000). Because qualified immunity is personal, we assess Samuelson's and Gregg's alleged conduct independently. Roberts v. City of Omaha, 723 F.3d 966, 974 (8th Cir. 2013). "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." S.M., 808 F.3d at 340.

Marsh does not allege that Samuelson or Gregg ordered or directed Campana to sexually assault female inmates, or Marsh particularly. Thus, their alleged liability cannot be based on direct participation in this constitutional violation. In this action, Marsh alleges that Samuelson and Gregg failed to protect her from the substantial risk of harm that Campana presented to herself and other inmates. She argues the

evidence that Campana might possibly have problems working around females, that he was counseled to be careful with his interactions lest he open himself up to a law suit, the verbal complaints of Johnson not wanting to work alongside Campana, and the evidence of Campana's character while performing his job duties, all support an inference that Samuelson and Gregg were aware of the risk Campana posed to female inmates.

Marsh claims as to Samuelson that it was his inaction against the "known" danger Campana posed that establishes his liability. Sheriff Samuelson is entitled to qualified immunity unless he had notice of a pattern of conduct that was sufficiently egregious in nature. Qualified immunity from supervisory liability turns on what Samuelson knew of Campana's actions. Id. Here, there is insufficient evidence to infer that Samuelson knew of any danger posed by Campana, and most certainly he did not receive notice of a pattern of unconstitutional acts. Much of the problem in this matter is that the evidence Marsh points to as creating material fact issues, is largely information garnered *after* Campana's suspension. That it became known later, when Campana no longer had a presence at the jail, there were red flags lurking but unknown at the time of his hiring does not create liability for Samuelson, nor does it create a fact issue on appeal when these facts were not known by Samuelson prior to Campana's suspension.

The record is devoid of evidence, other than the existence of Samuelson's superior position over Campana, that Samuelson had actual knowledge of the failings Marsh cites, took steps to put the elements of danger in place to facilitate the harms she highlights, or even turned a blind eye to glaring transgressions. Nothing suggests that Samuelson was aware of facts from which the inference could be drawn that Campana's employment posed an obvious risk of sexual assault to the female inmate population. Marsh's attempt to overlay the legitimately disturbing and concerning facts learned later during the NSP investigation *after* Campana's suspension, with those facts known by Samuelson (or Gregg) prior to that time, is disingenuous and

-15-

irrelevant to the inquiry before this court. When notified in May 2012 of Gregg's investigation of Stone's complaint concerning the masturbating female inmate, Sheriff Samuelson reviewed the relevant video footage and agreed with Gregg's conclusion that given the frequency of such instances by inmates, and the failure to see any of the on-duty officers (which included Campana) fixated on watching the screen at the time, no action was necessary. Subsequently, the very day Samuelson first learned of alleged sexual contact between Campana and an inmate, Samuelson placed Campana on leave pending an investigation and then in short order turned the investigation over to the NSP. There is no evidence to suggest that Samuelson had knowledge of the discomfort felt by Campana's coworkers regarding his professionalism and time with female inmates, as they only first discussed that (at least as far as this record reveals) with the NSP investigators. On these facts, a reasonable officer in Sheriff Samuelson's shoes would not have known that he needed to more closely supervise Campana. Id. at 340-42 (granting qualified immunity to a sheriff when there was no evidence that he had knowledge of sexual misconduct by an officer nor evidence that he acted with deliberate indifference). The district court correctly granted Samuelson qualified immunity.

Regarding Gregg, Marsh argues that her role was "larger," as she was the one who hired Campana. Marsh points to evidence that Gregg warned Campana in his performance evaluations that his unprofessionalism and fraternization with the female inmates could subject him to a lawsuit.[7] Marsh also argues that Gregg hired Campana without consulting references and without conducting a background check, both of which facts are belied by record evidence. Finally, Marsh claims that there were written policies that prohibited male officers from being in the female cells and

---

[7]Here Marsh emphasizes a specific comment on one of Campana's evaluations that he should "[l]imit time at female cell. Can open yourself up for a law-suite [sic]." Although Lieutenant Gregg signed off on that particular evaluation as the department supervisor, it was Campana's immediate supervisor, Sergeant Lee Woollen who administered it, although in Marsh's favor, we will attribute the warning to Gregg.

claims without record citation that Samuelson and Gregg were aware Campana "openly defied" those policies. "Assuming without deciding that 'turning a blind eye' could ever constitute actual notice" of wrongdoing sufficient to support a constitutional claim, being aware that Campana violated jail policy, without more, by accompanying female inmates in their cells "falls far short of notice of a pattern of conduct that violated" Marsh's constitutional rights. Id. at 341.

Marsh argues this case is akin to Kahle v. Leonard, 477 F.3d 544 (8th Cir. 2007), wherein this court denied summary judgment given the existence of material fact issues in a case where a trainee corrections officer under close supervision during a night shift entered the cell of an inmate three times in the course of an hour after lockdown, an occurrence that was unusual and (literally) noteworthy. Id. at 547-48. The officer sexually assaulted the inmate during each instance. Id. In Kahle, the court denied the supervising officer qualified immunity because, if the jury believed the events as established by the inmate, it could conclude that the supervisor was aware of a substantive risk of serious harm to the inmate and exhibited deliberate indifference to that risk. Id. at 552. Contributing to that determination were genuine issues of fact regarding the supervisor's knowledge of the risk created by the trainee's actions. The supervisor knew the trainee went to the female's cell three times after lockdown although no one was to enter cells at that time. Yet, there was a factual dispute as to whether the supervisor saw the indicator lights that change color when a cell door is opened to indicate the trainee was *in* the cell. The trainee also was at the cell several minutes, and there was conflicting evidence as to whether the supervisor could view the inmate's cell. Id. Thus, the obviousness of the risk was disputed. Id. In the instant matter, however, we do not have a factual dispute of an obvious risk. On the facts before us, neither Gregg (nor Samuelson) had information that would have raised an inference that Campana was violating his duties as an officer by sexually assaulting female inmates. It is not a reasonable inference on these facts, for example, to assume that a general claim that someone might possibly

-17-

have a problem working with women indicates that individual poses a threat of sexually assaulting women.

Lieutenant Gregg did not check with every single reference upon Campana's hiring and she did counsel Campana about unprofessional behavior with the female inmates, which included excessive chattiness and fraternization. Too, she had received a complaint of behavior that took place with a female inmate acting inappropriately within Campana's view while on his shift, and had previously been told that Campana might "possibly [have] problems working around females." One month before his suspension, Gregg was also approached by a female coworker who wanted to stop working shifts with Campana because she was uncomfortable with the amount of time he spent with female inmates. While in hindsight there might have been certain failings, the record facts do not establish that Gregg had notice of the obvious risk of physical assault that Campana posed to the female inmate population as Marsh proclaims. Other than the instances referenced above, Marsh does not point to evidence that Gregg had notice of a pattern of egregious, unconstitutional acts committed by Campana. Until Johnson's request in May or June 2012, one month before his suspension, all concerns were discussed with Campana and contained in his evaluations where he generally received satisfactory ratings. Like Sheriff Samuelson, the day Gregg first learned of alleged inappropriate sexual contact between Campana and an inmate, she conducted an investigation, notified her superior, and they placed Campana on immediate paid suspension pending the investigation. On these facts, there is no evidence that a reasonable officer in Gregg's shoes would have concluded that Campana posed an obvious risk of sexual assault to inmates. The district court correctly granted Gregg qualified immunity.[8]

---

[8]As to both Sheriff Samuelson and Lieutenant Gregg, because this matter is resolved based upon Marsh's failure to establish that they received notice of a pattern of unconstitutional acts committed by Campana, we do not discuss whether they were deliberately indifferent to or authorized those acts, a standard that requires Marsh to prove that Samuelson and Gregg personally knew of the constitutional risk posed by

## III.  CONCLUSION

For the reasons stated herein, we affirm.

_____

their inadequate training or supervision of Campana.  However, in point of fact, there is no evidence of deliberate indifference on the part of Samuelson and Gregg.  S.M., 808 F.3d at 341 (noting that deliberate indifference is a subjective standard that entails a level of culpability equal to the criminal law definition of recklessness and to be deliberately indifferent an official must both be aware of facts from which the interference could be drawn that a substantial risk of unconstitutional harm exists, and he must also draw the inference).